THE STEAMER OREGON, ROGER A. HEIRN, MASTER AND PART-OWNER, APPELLANT, v. JOSEPH AND FRANCIS ROCCA. THE STEAMER OREGON, ROGER A. HEIRN, MASTER AND PART-OWNER, APPELLANT, v. ROBERT TURNER AND WILLIAM TWIFORD.

Where a decree in admiralty was rendered in the circuit court upon an appeal from the district court, said decree being given *pro forma* because the presiding judge had been of counsel for one of the parties, this court has jurisdiction to try and determine the case.

Where a collision took place in the bay of Mobile between a schooner and a steamer, the latter was in fault.

The rule of this court is, when a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precaution to avoid a collision; and if this be not done, *primâ facie*, the steamer is chargeable with fault.

Whether this rule be regarded or the weight of the testimony, the steamer must, in the present case, be considered in the wrong.

THESE were appeals from the circuit court of the United States for the southern district of Alabama.

In the first case, a libel was filed in the district court of the United States for the southern district of Alabama claiming damages resulting from a collision between the schooner William Ozman and the steamer Oregon, in the bay of Mobile, on the 8th of September, 1849, whereby one hundred and forty bales of cotton on board said schooner were injured and in part destroyed.

In the second, a like libel was filed by Turner and Twiford as the owners of the schooner, claiming damages for injuries done to the vessel.

In January, 1851, the district judge decreed in favor of the libellants, in the first-named case for $6,599.64, and in the second for $1,989.47.

From these decrees the owners of the steamer appealed to the circuit court.

On the 21st of April, 1855, the circuit court passed an order in each case reciting that " the said cause being submitted to the court, a decree is rendered *pro forma*, the presiding judge having been of counsel for the defendants, affirming the judgment that was rendered in this case," namely, &c. &c.

An appeal from these decrees brought the cases up to this court.

The attention of the court having been called to this state of affairs, after consultation, the following order was passed in each case.

### Order.

It is now here considered by the court that although it appears from the record that the decree of the circuit court in this cause

was entered *pro forma*, yet that this court has jurisdiction to try and determine the case. Whereupon it is now here ordered by the court that this cause be and the same is hereby set down for argument next after the case fixed for to-day.

Dissenting-Justices, DANIEL and CATRON.

The cases were argued by *Mr. Johnson*, a brief being also filed by *Mr. Nelson*, for the appellants, and by *Mr. Phillips*, for the appellee.

Mr. Justice McLEAN delivered the opinion of the court.

These are appeals in admiralty, from the circuit court for the southern district of Alabama.

The first case is an appeal from the decree of the circuit court for damages resulting from a collision between the schooner William Ozman and the steamer Oregon, in the bay of Mobile, on the 8th of September, 1849, whereby one hundred and forty bales of cotton on board said schooner, alleged to belong to the appellees, were injured, and in part destroyed.

A similar libel was filed by the appellees as the owners of the schooner, claiming damages for the injuries done to the vessel. The libels are substantially the same, and they both rest on the same evidence.

The collision took place in the bay of Mobile, where it is eleven miles wide, and sufficient depth of water for the navigation of vessels. The schooner was sailing down the bay before the wind at the rate of six miles an hour. The Oregon was on her passage from New Orleans to Mobile, and was running at the rate of eight miles per hour. It was a starlight night, and the moon also shone. The collision occurred before daylight; but the vessels in approaching each other were seen from a mile and a half to two miles. Under such circumstances, it is extraordinary that they should come in contact.

The witnesses on board The Oregon say, that as the vessels approached each other, the schooner suddenly changed her course, which caused the collision; whilst the witnesses on board the schooner state, it was occasioned by a change of her course by the steamer. In such a conflict of testimony, where the vessels were both steamers or sailing vessels, and there were no leading facts for discrimination, fault would be chargeable to both vessels. But in the case before us the vessels, in regard to a collision, occupy a very different relation to each other. The steamer, having the propelling power, is under the control of her pilot. Her course may be changed, and her progress checked or arrested. Having this power to avoid a collision

with a vessel propelled by the wind, she is generally chargeable with fault, when such an occurrence happens. The exception to this rule must be clearly established, by strong circumstances, to excuse the steamer.

The vessels in question saw each other at the distance of more than a mile, probably a mile and a half to two miles. The Oregon was steering near a due north course; the course of the schooner was south. Both vessels continued their course until they came within one hundred and fifty yards of each other. As evidence that the steamer changed her course the fact is relied on that the schooner ran into the steamer, a little forward of midships, with her bow. This result might, possibly, have followed a change of course by the schooner. But, as the movement of the steamer was more rapid than the schooner, such an occurrence would not be so likely to happen, as an attempt by the steamboat to pass the bow of the schooner.

Several experts were examined on both sides to show that the theory of each is wrong, judging from the injury received by The Oregon. The witnesses give their opinions without reserve on this subject. We derive but little light from this part of the examination.

In St. John v. Paine, 10 How. 557, this court say: " As a general rule, therefore, when meeting a sailing vessel, whether closehauled or with the wind free, the latter has a right to keep her course, and it is the duty of the steamer to adopt such precautions as will avoid her." Practically, when a rule for this purpose is laid down, it is rendered ineffectual by admitting exceptions to it. The mind begins to waver as soon as the danger arises, and the exception, rather than the rule, becomes a subject of solicitude with the masters of both boats; and this, practically, annuls the rule, and causes the movements of both vessels to be uncertain. If the rule were absolute, and an insuperable difficulty should prevent one of the boats from observing it, it would be safer and better to slow the vessel or stop it, until the danger shall be past. This would occur so seldom as to be inappreciable, when compared to the safety it would secure. The rule adopted by the Trinity masters, and sanctioned by this court, is the safe one, that when two vessels on opposite tacks are approaching each other, each should turn to the right, passing each other on the larboard side. This rule is too simple to be misunderstood, and if observed, collisions would not occur between moving boats, whether propelled by sails or steam. The rule once established, every deviation from it should be chargeable as a fault.

The rule of this court is, when a steamer approaches a sailing vessel, the steamer is required to exercise the necessary precau-

tion to avoid a collision; and if this be not done, *primâ facie* the steamer is chargeable with fault. Whether this rule be regarded or the weight of the testimony, we think, in the present case, The Oregon was in the wrong. The decrees of the circuit court, are, therefore, affirmed.

Mr. Justice CATRON and Mr. Justice DANIEL dissented.

Mr. Justice DANIEL.

I am constrained by a sense of duty to differ with the court in their determination to take cognizance of these causes.

It is my deliberate opinion that these causes, in the form in which they are presented to our consideration, fall within no one of the categories, either in the constitution or the laws of the United States, by which the jurisdiction of this court or that of the circuit courts, have been conferred or prescribed.

The first thing to be observed with reference to these cases, is the fact that they are cases in which confessedly no decision has been made, no opinion formed or expressed, nor any judicial action had by the circuit court, in which the judges by their certificate declare, that they have forborne to mature or declare any judgment upon their character, and which they have sent to this court in effect to be moulded and settled *ab origine* by this court.

The true inquiry as to such a proceeding is, can this be done in conformity with the letter, the spirit, or the beneficial ends and design of the constitution and laws?

In article 3, sect. 2, of the constitution, the jurisdiction of this court, both original and appellate, is defined. The former is limited to cases affecting ambassadors, other public ministers and consuls. In all the other cases enumerated in this article, the jurisdiction of this court is appellate.

To my mind it would involve a solecism too gross for a moment's consideration, to suppose that by any distortion, the language or objects of this article of the constitution could be so interpreted as to invest this court with an appellate power over its own decisions; and yet it is not less an extravagance and a solecism, to contend that this court can by any direct or indirect agency, shape the original decision of any and every case which may be pending in a circuit court, and then recall such decision into this forum for a mere reiteration of what they had already determined and done, under the mere show of an appellate or revising jurisdiction. The framers of the constitution too well understood the nature of human frailty, the influence of prepossession or vanity to believe that, by such a proceeding, either wisdom or impartiality, or the safety of private right, would be promoted.

They have authorized no such proceeding, and the expositions of the constitution given in the organization of the courts by the acts of congress, conclusively show the conviction of the legislature as to the importance of restricting the several courts to that sphere within which their functions could be exercised wisely, impartially, and without the danger of bias or disturbance from foregone conclusions.

Thus, in the " Act to establish the judicial courts of the United States," it is provided by the 22d section of that act, that final judgments and decrees in civil actions and suits in equity in a circuit court, may be reëxamined and reversed or affirmed in the supreme court.

In the construction of this section the inquiry first suggests itself, what is it which the act of congress permits to be affirmed or reversed? The answer is, a judgment or decree. What is a judgment or decree? It is an act or conclusion of the mind, founded upon a view of all the facts and circumstances surrounding the subject as to which that conclusion is formed; and it is to be a final judgment, showing still more clearly that all the facts and circumstances have been weighed and appreciated. Such a judgment, it is provided by the statute, may be reëxamined by this court. Can it be rationally contended that such a judgment as the statute describes can be affirmed of a proceeding which on its face declares that no conclusion upon any fact or circumstance, nor on any question of law connected with it, has been formed? That all that has occurred is a mere formality, and nothing more, and has been adopted expressly to avoid a judgment. How can that be said to be reëxamined, as to which it is admitted there has been no previous examination?

Turning in the next place to the law by which divisions of opinion are authorized to be certified to this court, we find the language of the law to be thus. Act of April 29, 1802, § 6, 2 Stats. at Large, 159, " That whenever any question shall occur before a circuit court, upon which the opinions of the judges shall be opposed, the point upon which the disagreement shall happen, shall, during the same term, upon the request of either party or their counsel, be stated under the direction of the judges, and certified under the seal of the court to the supreme court." Here then is the sole authority by which certificates of division in opinion are permitted or directed; and what does that authority explicitly require? That there shall be pending in the circuit court a question or questions upon which the opinions of the judges shall be opposed; that there must be a disagreement between the judges, and that only the point upon which such disagreement shall happen, shall be certified. Can language be possibly plainer than this? I will not so far offend against com-

mon sense, as to. attempt an argument to show that opposition in opinion or disagreement has not existed between persons as to a matter with reference to which they have formed or expressed no opinion whatsoever, and with regard to which they declare that such is the truth of the case.

The cases before us comprise no one requisite prescribed by the constitution and act of congress.   Let us for an instant look to the consequences likely to ensue, which indeed must inevitably ensue, from the doctrine now promulged from this court ?   There are at this time, it is believed, thirty-one States in this Union, besides several territories ; and of these territories it has been recently stated on the floor of congress there is space sufficient for the formation of sixty additional States.   In a majority of the existing States, there have been created more than one dis- trict court, invested with circuit court jurisdiction.   If this privi- lege of forcing upon the supreme court the original decision of causes instituted in the circuit courts be legitimate, it appertains to every court possessing circuit court jurisdiction existing in the States already members of the confederacy, and must appertain equally to any number however augmented.   It cannot be extended to a portion of the courts and denied to the residue.

To those who already feel the burden of the litigation of this extended country, when restricted within the narrowest limits prescribed by the constitution and laws, it need not be shown what are to be the effects of throwing upon them the entire mass of circuit court duty and cognizance ; but beyond those who more immediately experience those effects, it becomes a subject of gravest reflection to every one interested in the regular and effectual administration of the law in the federal courts.

But it has been said that the practice sanctioned by the decis- ion in this case is warranted by the authority of precedent in this court.   It is undeniably true, that instances like the present, without having their nature or tendencies brought by argument 'to the test of examination, have several times occurred.   But can the simple fact that such instances have occurred, affect their justification in violation of the constitution and law, and to the absolute destruction of every thing like efficiency in the federal courts ?

I am fully impressed with the importance of precedent, and would never attempt to impair its influence within the sphere of its legitimate authority ; but I can never yield to it my sup- port, much less implicit obedience, when invoked for the pur- pose either of introducing or of hallowing abuses.   If the mere existence or the prevalence of these can impart to them either authority or sanctity, the cause of justice or morals would indeed be desperate ; there could never be reformation.   There has per-

haps never been a time in which many abuses in politics, law, morals, and religion have not obtained currency; indeed, the human imagination can hardly picture an error, a folly, a vice, or a crime, which has not had its prototype. But the decision cannot invoke the weight or authority of established precedent in its support. On the contrary the more recent and well considered cases determined by this tribunal, are in direct opposition thereto. Without entering upon them at large, the cases of White *v.* Turk et al. 12 Pet. 238; of The United States *v.* Stone, 14 Pet. 524; of Nesmith *v.* Sheldon et al. 6 How. 41; and of Webster *v.* Cooper, 10 How. 54, are confidently appealed to in support of this position. These cases, so well considered, and so recently ruled, are now in effect reversed, for the purpose of reviving a practice unauthorized by the constitution or by the legislation of congress; a practice necessarily fruitful of great mischief.

I object in fine to the decision in this case, because to me it seems calculated to impair, if not to destroy, that satisfaction and confidence which it is so desirable should everywhere prevail with reference to the proceedings of this tribunal.

With private persons, or in governments, or in public bodies of any description, there is no experiment or course of action more pregnant with danger, than is the exercise or the effort to exercise forbidden or even doubtful powers. Such an assumption rarely fails to react, or to operate reflectively upon those by whom it is essayed; never, indeed, except in instances in which it can be sustained by a power absolute and irresponsible enough to repress opposition, or to silence the expression of public sentiment. In such instances, but in those only, the act or the attempt can be safe. But under our system of polity no immunity was ever designed, much less has one been provided for any thing of this kind. With whatever deference and to whatever extent, therefore, the opinions of this tribunal may be recognized, (and by no one will they within their proper bounds be maintained with truer loyalty than by myself,) yet when challenged to obedience to those opinions, I am bound to remember that the constitution is above all and over all, and that public opinion conveyed through its legitimate channel, the legislation of the country, will cause itself to be heard and respected.