## THE CAMDEN.

### EASTERN S. S. LINES, Inc., v. LEHIGH & WILKES-BARRE COAL CO.

(District Court, D. Massachusetts. May 9, 1922.)

Nos. 1867, 1949.

1. **Collision** ⊗⟶82(2)—Excessive speed in fog.

A steamship, proceeding in a fog in frequented waters at such speed that she could not stop after seeing a vessel ahead in time to avoid collision, and which also failed to stop on hearing the fog signal of another vessel forward of her beam, as required by article 16, International Rules (Comp. St. § 7854), *held* in fault for the collision.

2. **Collision** ⊗⟶82(2)—Passenger steamer not exempt from collision rules.

That a passenger steamer is on a time schedule does not exempt her from the rules for preventing collision in a fog.

3. **Collision** ⊗⟶58—Tows must be made up with reference to safety of other vessels.

Under International Rules, arts. 27, 29 (Comp. St. §§ 7866, 7868), it is the duty of commanders of tows to arrange and navigate them, not merely with regard to their own convenience and safety, but with reasonable care and regard for other vessels rightfully on the sea.

4. **Collision** ⊗⟶80—Unnecessary length of tow and failure to sound fog signals faults.

A tug with three barges in tow on hawsers, the whole extending 4,000 feet, navigating in a fog near the entrance to Boston Harbor, where the tow was in the way of other inbound vessels, *held* in fault for a collision between an inbound steamer and one of her barges, and the barge, which was half a mile behind the tug, also *held* in fault for not sounding fog signals.

In Admiralty. Suit for collision by the Lehigh & Wilkes-Barre Coal Company against the steamship Camden, the Eastern Steamship Lines, Inc., claimant, with cross-libel. Decree dividing damages.

Pitt F. Drew, of Boston, Mass., for libelant.

Edward S. Dodge, of Boston, Mass., and Nathan W. Thompson, of Portland, Me., for claimant.

MORTON, District Judge. This is a case of collision in fog, between the steamer Camden and barge No. 3 in tow of the tug Nottingham. It occurred about 5:30 a. m. on November 11, 1920, near the entrance to Boston Harbor. The barge sank, but without loss of life. The essential facts are simple and, for the most part, clearly established.

The Nottingham, having in tow barges No. 2, No. 3, and No. 5, in the order named, was bound for Salem and Boston. The hawsers connecting the tow were each about 175 fathoms long, so that the total length of the tow (disregarding the shortening due to sag of the hawsers) was nearly 4,000 feet. In the early morning of November 11th, while it was crossing Massachusetts Bay, a dense fog shut down. There was practically no sea, and only a very light breeze from the southwest. On entering the fog, the speed of the tug was reduced; and it was again reduced after passing Boston Lightship, in order not to make the coast before daylight. I find that the speed of the tow was moderate and proper.

Regulation fog signals were sounded by the tug. Under article 15 of the International Rules (Comp. St. § 7853), towed vessels are not required to give fog signals, but may do so if circumstances demand such precaution. Barges No. 2 and No. 3 gave no signals. Barge No. 5, the tail barge, did give them on her horn. As to lights, the testimony is that No. 3 had proper lights, properly set and burning; and I so find. No. 3 had no lookout; there was a helmsman in her wheelhouse aft. No question arises as to the manning or operation of the other barges. The tug had no lookout, except the man in her pilot house, about 35 feet from the stem.

As the tow was approaching the Whistling Buoy, off the Graves, which it had to make, the tug heard nearly abeam on her starboard side the fog signals of an approaching steamer, which later turned out to be the Camden. The men in charge of the tug supposed rightly that the signals came from one of the Eastern Steamship Company vessels bound into Boston. The tug held her course and speed, and continued to sound her signals and to hear those of the other vessel. She did not at any time see the steamer; but from astern she heard the steamer give backing signals and the call for help. This occurred about half past 5, 15 or 20 minutes after the steamer had been first heard. The tug did nothing, however, and kept on. No sound of distress from any of the barges reached her, and it was not until three-quarters of an hour later that, discovering she was not moving ahead, her officers thought something must be wrong with the tow, and went back and found that No. 3 had been sunk, and the tug had been pulling on the barge lying on bottom.

Turning to the Camden's story of the accident: She is a passenger and freight packet, having a regular schedule between Maine ports and Boston. She had on board 150 passengers and a full cargo of freight. Being caught in the fog, she was making for the Graves Whistling Buoy, in order to get a departure for entrance into the channel. She had a lookout on her forward deck, her master and her chief pilot were in the pilot house, and there was a man at the wheel. All were alertly attending to their duties. Several minutes before the accident she heard the fog signals of the tug on her starboard bow, and a minute or two later the faint sound of a horn, which came from the tail barge, on her port bow.

The tow seems to have been squarely between her and the buoy for which she was running. Her officers testify that they did not at once appreciate that the sounds to starboard and to port both came from a single tow, being misled by the distance which separated them into believing that there were two tows. The steamer did not, therefore, stop her engines as soon as the sounds were heard. The engines were already at slow, and were kept that way for a time. Then they were stopped, and almost immediately barge No. 3 was made out dead ahead and close at hand. The steamer's engines were promptly reversed, but within about a quarter of a minute the Camden struck the barge on the starboard side, between the main and mizzen masts, at about a right angle, and cut half way through her. The blow was severe enough to lift and heel the Camden, so that it was noticed in her engine room.

The Camden backed clear of the barge, and the latter almost immediately went down.

The opposing parties are in wide disagreement as to the speed of the Camden at the time of the collision. Her evidence is that it was not over 3 or 4 knots. At the other extreme, the master of barge No. 3 estimates it as about 10 knots. The movements of the Camden's engines, as given on her engine room log, are shown, and from them it is argued on her behalf that she must have been moving very slowly. This inference is, however, disputed by the libelant, and the Camden's entire story about her speed is challenged and denied. According to the Camden's own testimony, her speed was not generally reduced because of fog; she was accustomed to drive through it in order to make her schedule, trusting to luck and her lookout to avoid disaster. This habitual disregard of the requirement to reduce speed in fog does not, to say the least, predispose one to a belief that at the time in question her speed happened to be moderate.

[1, 2] The computations or estimates based in her engine room log are not very certain; they do not, in my judgment, outweigh the natural inferences from the severity of the blow, which certainly suggest that the Camden was moving pretty fast when she hit the barge. It takes quite a blow to lift and heel such a steamer and to cut 16 or 17 feet into a heavily built barge full of hard coal. It is unnecessary to discuss the point minutely, because under The Sagamore, 247 Fed. 743, 159 C. C. A. 601, the Camden, not being able to stop in frequented waters within seeing distance, was at fault for immoderate speed, and under Lie v. S. F. & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726, she was also at fault for failing to stop her engines immediately on hearing a signal forward of her beam. The contention, made on her behalf, that the usual rule should not be applied, because she was carrying passengers and it was important to get them into port, is without support in any decision of the Supreme Court; it would introduce a variation of the rule, which would be difficult and confusing in practical application, and it seems to me unsound. Exceptions to a rule, if allowed, make the rule ineffectual. The Oregon, 18 How. 570, 15 L. Ed. 515.

[3, 4] No discussion is necessary to show that a tow four-fifths of a mile long, proceeding in a dense fog near the entrance to a frequented harbor, where many vessels may be converging, is a great peril to other vessels. In this instance the tow practically cut off the approach from the north and the east to the Graves Buoy, one of the principal aids to entering Boston Harbor in thick weather, which a large proportion of inward bound vessels try to make. Towing on hawsers is a legal method of transportation; but it is the duty of commanders of tows to arrange and navigate them, not merely with regard to their own convenience and safety, but with reasonable care and regard for other vessels rightfully on the sea. This is required by International Rules, arts. 27 and 29 (Comp. St. §§ 7866, 7868). In The Gladiator, 79 Fed. 445, 446, 447, 25 C. C. A. 32, 33 (C. C. A. 1st Cir.), Judge Putnam said:

"We must hold tugs which navigate this coast with such long and essentially hazardous fleets to the use of the extremest care in the interest of common safety."

In view of the great dangers from long tows, this requirement demands, I think, that in narrow passages or congested waters the length of tows be reduced as much as is practically possible. I cannot assent to the contention, made on behalf of the Coal Company, that—

"Except for special local regulations a tug and tow of any length has an absolute legal right to be anywhere." (Libelant's Brief, p. 14.)

Unnecessary length, where it is likely to endanger other vessels, seems to me a grave fault. Nor am I able to accept the testimony, given on behalf of the tug, that it was impracticable to shorten hawsers before the accident—something which was in effect done apparently without difficulty immediately afterwards. I have no doubt whatever that the length of this tow as it approached Boston Harbor could with safety and without undue risk or exertion have been reduced one-half, if not two-thirds. Whether the Camden was on her proper course or not when she struck the barge seems to me unimportant; she was certainly trying to make the Graves Buoy, and the tow was squarely across her path. In my opinion, the tug, in failing to shorten her tow, was greatly lacking in due care towards other vessels, and was by no means exercising that high degree of diligence which was required of her; and I so find. The rights of the barge and her owners in this particular stand or fall upon the conduct of the tug.

From barge No. 3 to the tug was nearly half a mile, every foot of which was obstructed to other vessels, most of it by hawsers, in a way particularly hard to discover and correspondingly dangerous, especially to sailing vessels and small craft. Over that distance no signals were being given. It seems to me that it was the duty of the barge, both for her own safety and that of other vessels, to give fog signals on her own account. If she had done so, it is quite possible that the disaster would not have occurred. In The America, 102 Fed. 767, 42 C. C. A. 617, a towed vessel was held at fault for having no lookout. The court said:

"A tow, using in such waters a hawser one-sixth of a mile long, ought to anticipate that contingencies of navigation may require her to rely on her own precautions for her own safety and the safety of other vessels, and not depend exclusively upon those which may be exercised by the tug."

I doubt whether the lack of a lookout contributed to the accident in this case; but I find the barge to have been at fault for not sounding fog signals. It is unnecessary to pass upon the other faults charged against her and the tug.

Decree for divided damages, and referring the case to an assessor to state them.