## THE COHOCTON. THE WALTER FRANKS. THE MARY W. POTTER.

(District Court, S. D. New York. June 5, 1923.)

1. **Towage ⚙️11(10)—Tug held to have properly anchored her tow within anchorage grounds.**

    A tug *held*, on conflicting testimony, to have properly anchored her tow of barges in a fog within anchorage grounds and not in the fairway.

2. **Collision ⚙️81—Anchored vessels, sounding fog signals in turn, held not compliance with rule.**

    That each of three barges, comprising a tow anchored in a dense fog, in turn sounded her fog bell once every three minutes, *held* not a compliance with Inland Rules, art. 15 (d), being Comp. St. § 7888, which provides that "a vessel when at anchor shall, at intervals of not more than one minute, ring the bell rapidly for about five seconds."

3. **Collision ⚙️83—Barge anchored in fog and not sounding fog signals held not entitled to recover for collision.**

    A barge, anchored in a fog and not sounding fog signals as required by the rules, which was run into by a moving tug, *held* not entitled to recover damages, though the tug was moving at more than lawful speed.

In Admiralty. Suit for collision by the Potter Transportation Company, owner of barge Cohocton, against the steam lighter Walter Franks and the steam tug Mary W. Potter. Libel dismissed.

Decree modified 299 Fed. 319.

Bigham, Englar & Jones, of New York City, L. J. Matteson, of New York City, and C. W. Hagen, of East Orange, N. J., for libelant.

Duncan & Mount, of New York City, and Warner Pyne, of New York City, for The Mary W. Potter.

Park, Mattison & Lynch, of New York City, and Anthony V. Lynch, Jr., of New York City, for The Walter Franks.

WARD, Circuit Judge. May 22, 1919, at about 3:30 p. m., the tug Potter, with three seagoing coal-laden barges abreast on two hawsers, libelant's barge Cohocton being the port hawser boat, came out of the

Kills and anchored the barges, as her witnesses say, on the Robbin's Reef anchorage grounds; the fog being then dense. May 23, about 6:30 a. m., in dense fog, the steam lighter Franks struck the port quarter of the Cohocton, whose owner filed this libel against the Franks and the Potter to recover his damages.

The libelant charges that the Potter anchored the barges in the fairway outside of the anchorage grounds and that the Franks was navigating at an immoderate speed in the fog. The claimant of the Potter alleges that she anchored the barges properly. The claimant of the Franks alleges that the Cohocton was anchored outside of the anchorage grounds, and was not ringing her bell, as required by Inland Rules of 1897, art. 15 (d), being Comp. St. § 7888.

[1] In view of the very inconsistent testimony of the witnesses as to whether the barge was or was not anchored within the Robbin's Reef anchorage grounds, I have to rely largely upon probabilities in coming to a conclusion.

Stapleton, master of the ferryboat Manhattan, says he saw this flotilla about 8 a. m. of the 23d 1,000 feet off Piers 5 and 6, Staten Island; and Edwards, master of Standard Oil Co. No. 17, says he saw it on the morning of the 23d in the fairway about 1,000 feet off the Staten Island shore. Both these witnesses are disinterested, but I think their observation was not very particular, and that their estimates of distances are mere guesses.

Nickerson, master of the Potter, arrived at Constable Point about 3:30 p. m. May 22, with the barges on two hawsers. The weather was getting hazy, and he took a departure from the two northerly piers on the Jersey side of the Kills, proceeding slowly on a course east toward Robbin's Reef bell buoy, which was ringing, the fog becoming thicker all the time. When he got Robbin's Reef lighthouse whistle about 4 points on his port bow, he turned northward, and when heading northwest anchored the tow, which was heading west northwest. This he said would have brought the tow north of a line between Robbin's Reef bell buoy and the stacks on Constable Point, which constitutes the southern range of the anchorage grounds. Then he steered east southeast, and passed the bell buoy about 50 yards off on his port side. I am satisfied that this left the tow on the anchorage grounds. The next morning he returned and found the tow at the same place, 1,500 to 1,600 feet from Staten Island, towed away the other two barges, leaving the Cohocton at anchor, where she remained two or three days.

On the morning of the 23d Seekand, captain of the water boat Bonita, about 8 a. m. went aboard the Cohocton at the request of her captain to locate the barge, because the captain of the Franks had said she was not on the anchorage grounds. He located the tow about the middle of the range from the bell buoy to the stacks at Constable Point, within the anchorage grounds.

Captain Nickerson was in the habit of anchoring barges on these anchorage grounds; it was his duty to leave them there, and I am satisfied that he did so. The Cohocton remained two or three days at the same anchorage, and if she had been in the fairway I think the federal authorities would have required her to be moved.

[2] The Franks was proceeding at slow speed, with a lookout at the bow, and blowing the usual fog signals, as it was her duty to do. On the other hand, the captain of the Cohocton said that no watch is kept on barges at anchor at night, so that no bell is rung in fog unless for some reason those on board discover the fog. The record of the Robbin's Reef light station shows that fog began May 23 at 3:30 a. m. and ended 8 a. m. Capt. Nickerson says that, when he came up on deck in the morning, her bell began to be rung about 6 a. m. and then the other boats rang in succession with her, each boat once in three minutes. I know of no authority whatever for such practice, which raises the question whether the flotilla needed but one bell to be rung a minute, or whether the rule required each boat to ring her bell for a period of five seconds at not less than once every minute.

Collisions, both on the high seas and in inland waters, were regulated by section 4233, U. S. Rev. Stat.; rule 15 (d), being Comp. St. § 7957, providing:

"Coal boats, trading boats, produce boats, canal boats, oyster boats, fishing boats, rafts, or other water craft, navigating any bay, harbor, or river, by hand power, horse power, sail, or by the current of the river, or anchored or moored in or near the channel or fairway of any bay, harbor, or river, and not in any port, shall sound a fog horn, or equivalent signal, which shall make a sound equal to a steam whistle, at intervals of not more than two minutes."

Inland Rules of 1897, § 5, repealed section 4233, and put canal boats and barges in subdivision of article 15 (d), being Comp. St. § 7888, which covers all vessels not steam or sail at anchor in a fog:

"Art. 15. * * * (d) A vessel when at anchor shall, at intervals, of not more than one minute, ring the bell rapidly for about five seconds."

Judge Wallace, in the case of The Raleigh (C. C.) 44 Fed. 781, decided December 3, 1890, under rule 15 (d) of section 4233, said:

"The remaining question is whether the libelant was not in fault for the collision, as well as both the steam boats. The statute prescribes that 'canal boats * * * anchored or moored in or near to channel or fairway of any bay, harbor, or river, and not in any port, shall sound a fog horn, or equivalent signal, * * * at intervals of not more than two minutes.' The terms of this statute are not restricted to canal boats when they are independent vessels, but are broad enough to apply to canal boats under all circumstances when anchored in a fog, and to include a canal boat when she is lying among a flotilla in a fog, under charge of a tow boat. It may well be that an inside boat in a flotilla should not be considered as within the spirit of the statute, and should therefore be treated as not within its meaning, because no practical benefit would result from her signals. However this may be, there seems to be no reason why the statute should not be read as requiring the outside boats of such a flotilla to observe the signals. Surely a multiplication of danger signals to indicate the presence of a stationary object, or a collection of anchored boats, covering a large expanse of water in a fog, could do no harm.

"The present case illustrates how it might be useful. If one canal boat in each of the six tiers here had kept sounding a fog horn at intervals of two minutes while they were at anchor, who can doubt that the chorus of signals would have told the Raleigh, even before she left the dock, certainly before she took her westerly course across the river, of the presence of an anchored flotilla, and warned her of the necessity of extra caution. The language of the statute is explicit and unequivocal. There is no room for interpretation, and it covers the case of a canal boat in the situation of the libelant's boat. It may impose a duty towards other vessels upon the towing vessel having

control of a flotilla under circumstances like the present to maintain proper signals on her tows. However this may be, the statute is addressed directly to the tows themselves when they fall within the described class, and the duty of obeying it is therefore primarily upon the owner of the tow."

This language applies perfectly to the present provision of Inland Rules, art. 15 (d). Therefore the libelant's barge was at fault for ringing her bell only once every three minutes.

[3] It is said that the Franks is at fault because her speed was such that she could not avoid the Cohocton when she first came in sight. But that rule is subject to the well-known exception that the other vessel must be conforming to law. The Cohocton was not, and, if she had rung her bell every minute, the Franks might have come to a stop sooner.

The libel is dismissed.