## THE SOUTHWAY.

### M. & J. TRACY, Inc., v. WILLIAMS BROS. CARDIFF, Limited, and nine other cases.

(District Court, E. D. New York. August 4, 1924.)

**1. Collision ⬤⟶82(1)—Steamship held in fault for collision with moored vessels in fog.**

A steamship *held* in fault for collision with boats, properly moored to a stakeboat in a fog, for not anchoring when the fog became so dense that it was impossible to see for any distance.

**2. Collision ⬤⟶81 — Each vessel in a flotilla moored in a fog is required to give fog signals.**

Each vessel in a flotilla moored to a stakeboat in anchorage grounds in a fog is required to comply with Inland Rules, art. 15, subd. (d), being Comp. St. § 7888, by giving fog signals.

In Admiralty. Suit by M. & J. Tracy, Inc., against the steamship Southway, Williams Bros. Cardiff, Limited, claimant, with the Port Reading Railroad Company impleaded, consolidated for trial with other libels against the same vessel and cross-libels by claimant. Cross-libels dismissed, and decrees for some libelants for full and for some for half damages.

Foley & Martin and J. A. Martin, all of New York City, for M. & J. Tracy and William J. Barrett.

Macklin, Brown & Van Wyck and Richard Lenahan, all of New York City, for Port Reading R. Co.

Burlingham, Veeder, Masten & Fearey, Chauncey. I. Clark, and Frederic Conger, all of New York City, for Williams Bros. Cardiff, Limited.

Park, Mattison & Lynch and Henry E. Mattison, all of New York City, for McWilliams Bros., Inc., and Armstrong Transportation Co.

Leo J. Curren, of New York City, for James McWilliams Blue Line, Inc.

James E. Woods, of New York City, for Thomas A. O'Neill and Michael K. Neville.

CAMPBELL, District Judge. By stipulation all of the above cases were tried together, the first eight on libels alleging that damages were caused to libelants' vessels by the steamship Southway, in which actions the Port Reading Railroad Company has been impleaded as respondent, on the petition of Williams Bros. Cardiff, Limited, claimant, under the fifty-sixth rule in admiralty, and the last two being on cross-libels filed by the owner of said steamship, and one opinion will suffice.

By permission of the proper harbor authorities the Port Reading Railroad Company, some years before the day in question, anchored a stakeboat on the flats northward of Ellis Island, and the permission for the maintenance of said stakeboat was annually continued and was in force on the day in question. Some distance to the south of the Port Reading stakeboat, but on the flats to the northward of Ellis Island, by permission of the proper harbor authorities, the James McWilliams Blue Line, Inc., some years before the day in question, anchored a stakeboat (Blue Line No. 3), and the permission for the maintenance of said stakeboat was annually continued and was in force on the day in question. These stakeboats were reasonably safe anchorage places, and no fault was committed in tying up the barges at said stakeboats.

Between 5 and 6 o'clock in the afternoon of that day 19 boats were tied up at the Port Reading stakeboat. The Harold, owned by Michael K. Neville, was made fast alongside of the stakeboat on the port side. The remaining 18 boats were tied up astern in five tiers, the first four tiers being of 4 boats each, and the fifth of 2 boats, one astern of the port boat of the fourth tier, and the other astern of the boat lying next to port of the starboard boat of the fourth tier. The Gibson and Cape Brown were owned by M. & J. Tracy, Inc.; the H. F. Allen by McWilliams Bros., Inc., the Sarah A. Johnson by the Armstrong Transportation Company, Inc., the Westmoreland by William J. Barrett, and the Mamie O'Neill by Thomas A. O'Neill. At the same time three boats were tied up at the Blue Line stakeboat No. 3, astern in two tiers; the Helen being the starboard boat and the McCusker & Schroeder being the port boat in the first tier, and the Gregory being the only boat in the second tier and tied up astern of the McCusker & Schroeder.

There was fog from before midnight April 4, 1923, to 7 p. m. April 5, 1923, and the fog was dense from 3 p. m. to about 5:40 p. m., according to the records of the Weather Bureau, and there was rain during periods of this time. These records also show that the wind was southeast 31 miles an hour from 3 to 4 p. m., 40 miles an hour from 4 to 5 p. m., and 43 miles an hour from 5 to 6 p. m. There was a thunder squall, with high winds from the northwest, which lowered and blew from the north, and rain between 5:30 and 8:15 p. m.

At about 4 p. m. on April 5, 1923, the steamship Southway, 336 feet over all, 48 feet beam, of steel construction, and having a single screw, assisted by two tugs, backed out from a pier at Edgewater, N. J., straightened out, and started down the river bound for Baltimore. The master was not aboard, as she had gone ashore at the direction of the British consul to pay off a seaman, who could not leave with the ship, and he was to be picked up off the Battery Point from a tug, and the chief officer was in command. The chief officer and a Sandy Hook pilot were on the bridge outside the wheelhouse, and one of the crew, an able seaman, was at the wheel inside the wheelhouse, the windows and doors of which were open. The second officer was keeping watch aft on the poop and one of the crew was placed as lookout right in the bow of the ship. The ship had the full ship's company required by law.

When the Southway cast off it was hazy, there was a clear, strong, southeast wind, and the tide was ebb. You could see both sides of the river. The Southway proceeded down the river at half speed, and when opposite Pier 15, North River, Manhattan, the fog became very thick, and it was impossible to pick up the master. She was going down along the docks on the New Jersey side of the river, and the ferryboat Red Bank, going from Liberty street, New York, to Jersey City, was obliged to back and let the Southway pass. After that the Southway headed out in the stream. The fog became heavier, and at 5:10 the engines

were stopped. There was still steerage way on the ship, and she was being assisted down the river by the ebb tide. All this time the Southway was sounding fog signals on her siren; the second officer, having gone on the bridge when the fog thickened, was sounding the whistle, the lookout was at all times in the stem, and when the fog thickened the carpenter, under orders, went on the forecastle head and stood by the anchor. The lookout was about 100 to 120 feet from the bridge and could barely be seen from the bridge. He could not see over the water for more than 50 feet.

At 5:20 those on the bridge and the lookout suddenly saw the Port Reading stakeboat loom up about 40 to 50 feet distant, and on the starboard bow, just under the bluff of the bow. The Southway struck the stakeboat, breaking her and the boats tied up at her loose, and causing them to go adrift; the Cape Brown fetching up on an iron buoy, and all of the boats being picked up by tugs. The steamer then brushed along the stakeboat, and struck in the center of the bow the Sarah A. Johnson, the boat next to port to the starboard boat of the first tier, causing the said Sarah A. Johnson, with her cargo and the captain's effects, to sink. The starboard side of the bow of the Southway, about 15 or 20 feet from the stem, came into contact with the starboard bow of the stakeboat, and the stem of the Southway came into contact with the Sarah A. Johnson, at about the middle of her bow. When the stakeboat was sighted, the orders were given to reverse the engines of the Southway; but they did not take effect at once, and the Southway was not under such control that the collision could be averted. The fog was thick, and the lookout, carpenter, and those on the bridge of the Southway were unable to see how many boats were in the flotilla.

After striking the Johnson, the Southway either backed away or the flotilla drifted away from her, and in a minute those on the Southway lost sight of the stakeboats and the flotilla. The Southway backed full speed astern for about three or four minutes, slowed down, stopped, and went ahead a little. She did not see the Port Reading stakeboat and the boats tied up at that stakeboat again. The Southway drifted down, and at 5:25 p. m. her propeller struck the Blue Line stakeboat No. 3 on the port bow, making a hole, and causing her to go adrift with the three boats tied up at her, and they were picked up by tugs. After going clear, the Southway at 5:30 dropped

her starboard anchor, and, the fog lifting at 5:40, she discovered she was too close to the shore and weighed anchor. The fog was then thinning out. At about 6:15 or 6:20 the Southway picked up the master and proceeded on her voyage. During all the navigation of the Southway from the time of leaving Edgewater until after the collision, the Southway was in charge of the pilot, who gave the orders for the engine movements and steering of the ship.

At the time the Southway struck the Port Reading stakeboat, and from the time the fog thickened, the stakeboat was giving the proper fog signal with her bell, which was an old locomotive bell, and was placed on the port corner of the house aft, about 12 feet above the deck. When the Southway was about to strike the stakeboat, the captain dropped the bell rope and went to the starboard side, saw the steamer strike the stakeboat's corner, go by, and strike the Johnson.

The Sarah A. Johnson had a bell located aft, and her captain had been ringing it, giving the proper fog signal, until a few minutes before the collision, when the captain of the Johnson went forward to look at his lines, which does not excuse her. The stakeboat was then giving the fog signal with her bell, and he relied on that signal. He jumped on the next boat when the Johnson was struck and saved himself. The H. F. Allen had a bell, and her captain had been for some time, and was at the time of the collision, giving the proper fog signal with the bell. The Gibson, Cape Brown, Westmoreland, Harold, and Mamie O'Neill did not have bells, but were before and at the time of the collision making noises with hammers on various metal utensils. The Blue Line stakeboat No. 3 was equipped with a bell, and was giving the proper fog signal at the time she was struck by the Southway, and had been giving such signal from the time the fog thickened. The stakeboats and the barges tied up to them were without motive power and could do nothing to prevent the collision.

[1] The Southway was without fault in getting under way at Edgewater, because I believe the testimony of the pilot and officers of the Southway that there was only a haze at that time, and in my opinion the heavy fog was blown in by the southeast wind; but the Southway was in fault, in that she was not sufficiently under control to prevent the collision when the respective stakeboats were sighted. The Southway was at fault in not anchoring when it be-

came impossible for her to see a boat at a sufficient distance to navigate with safety. The Haven (C. C. A.) 277 F. 957; The Camden (D. C.) 283 F. 326; The Tug Walter Franks (C. C. A.) 1924 A. M. C. 827, 299 F. 319. The stakeboats had been located at the same places for some time, and their location should have been known to the pilot, and as the Southway was attempting to find her way to the anchorage, she should have used care to avoid striking the boats she could have reasonably expected to find anchored there, and she is therefore at fault.

[2] Article 15, subdivision (d), of the Inland (Pilot) Rules (Comp. St. § 7888) provides as follows: "(d) A vessel when at anchor shall, at intervals, of not more than one minute, ring the bell rapidly for about five seconds." This rule was not obeyed by the Sarah A. Johnson, Gibson, Cape Brown, Westmoreland, Harold, and Mamie O'Neill, all of whom, except the Johnson, were making noises of other kinds, which in volume of sound, in addition to the bells which were being rung, should have apprised the Southway, if the proper attention was being given by her to signals.

But still the requirement is specific, and I cannot disregard it, nor can I say that their failure to obey the rule did not contribute to the collision. The Cohocton (D. C.) 1923 A. M. C. 737, 299 F. 316; The Watuppa (C. C. A.) 283 F. 8. And therefore, as to the libelants whose boats failed to obey the rule, but half damages, with half costs, can be awarded against the Southway; while as to the libelants whose boats obeyed the rule, and gave the proper fog signal, full damages, with costs, are awarded, and all petitions filed by Williams Bros. Cardiff, Limited, against the Port Reading Railroad Company are dismissed, with costs to the respondent impleaded against the petitioner.

Libelants claimed that, inasmuch as the stakeboat was giving the proper signal, they were relieved from the obligation to give the required signal; but this claim cannot be sustained, because the larger the flotilla the greater the necessity for each boat to give the signal, in order to notify any approaching vessel of the number of boats to be avoided, lest by but one boat giving the signal the approaching vessel be misled, and in avoiding one come in contact with the others. The form of signal given by the boats which did not give the bell signal was, not the signal for a vessel at anchor, but one which is required to be given by boats lying at the ends of piers. The Port Reading stakeboat was giving the proper signal, and she is without fault as to any libelant or petitioner. The Blue Line stakeboat No. 3, was giving the proper signal, and is without fault as to any libelant or petitioner.

The injuries to the plates of the Southway were caused when she struck the Port Reading stakeboat, and not when she struck the Sarah A. Johnson, and were caused solely by the fault of the Southway in not being under control, so that the collision could be avoided, and in not anchoring when the fog became too thick for navigation, and no recovery can be had by the Southway against any of the respondents in the two cross-libels for such injuries, or any others alleged in her cross-libels, which should be dismissed, with costs.

A decree or decrees may be entered in accordance with this opinion, with the usual order or orders of reference.