THE A. DEMEREST, etc.

THE PEQUOT, etc.

RONAN v. THE A. DEMEREST, etc., and another, etc.

(*District Court, S. D. New York.* January 5, 1886.)

1. COLLISION—LOOKOUT—EAST RIVER NAVIGATION.
A steamer in the night-time, in the East river, seeing a red light nearly ahead, but on the port hand, is not thereby excused from keeping any further watch upon that light; especially in view of a known practice for boats in that vicinity to go to the left.

2. SAME—BROOKLYN BRIDGE—ELECTRIC LIGHTS.
Upon evidence showing that the electric lights on the Brooklyn bridge dazzle the eyes of pilots nearing the bridge, so that for several hundred feet on either side they cannot properly distinguish the ordinary lights of vessels ahead, *held,* that common prudence requires that this space be passed over at only moderate speed, as in cases of fog.

3. SAME—CROSSING TO LEFT—CUSTOM, WHEN NO DEFENSE.
The practice of tugs coming down with the ebb-tide to go voluntarily to the left, near the Brooklyn shore, above the bridge, is no legal justification or excuse for a tug's crossing the river from the New York side for that purpose in the night-time, within a half mile of the bridge, considering the liability to meet ascending steamers, and the blinding effect of the electric lights.

4. SAME—CASE STATED—STOPPING AND BACKING—MUTUAL FAULT.
The steamer P., bound up, came in collision with the tow of the D., coming down with the ebb-tide, a short distance above the Brooklyn bridge, in the evening, and about one-third the distance across from the Brooklyn shore. A third of a mile above, the D. was on the New York side of the center of the river, and showed her red light to the P. a little on the latter's port bow. The D. unnecessarily crossed the river to go to the left, as often practiced in that vicinity, and soon gave the P. two whistles. The P. replied with one. Neither slackened speed until a second exchange of contrary signals, when near each other, and the collision was then inevitable. The P. kept no watch on the D. after seeing her red light until her signal of two whistles was heard, and the D.'s green light was then seen for the first time. *Held,* both in fault, —the P. for not keeping up her watch on the D. after seeing her red light, specially in view of the known practice for descending tugs to go near the Brooklyn shore, also for not reversing at the first contrary signals, and also for not moderating speed in going through the glare of the electric lights of the bridge; the D. for crossing the river under such circumstances, and for not reversing at the first contrary signals.

In Admiralty.

*Carpenter & Mosher,* for libelant.

*Hyland & Zabriskie,* for the A. Demerest.

*Miller, Peckham & Dixon,* for the Pequot.

BROWN, J. The collision in this case occurred in the East river, after dark, a few hundred feet above the bridge, nearly abreast of or a little below Catharine-street ferry, and probably about one-third of the way across from the Brooklyn shore. The steam-tug Demerest was coming down with the ebb-tide, with a canal-boat lashed on each side, projecting some 40 feet ahead of the tug's stem. At the moment of collision, the tug had headed considerably to the Brooklyn shore. The steamer Pequot, coming up, ran through and cut off the bow end of the starboard canal-boat without touching the stem of

the tug.   There is considerable contradiction as regards the lights seen or visible, and also as to the signals given and heard.

The witnessess for the Demerest say that from Jackson street down the tug was heading somewhat towards the Brooklyn shore, so that their *green* light only was visible to the Pequot, which they say was a little on their starboard bow.   The Pequot's witnesses say that they saw the Demerest's *red* light on their port bow, and hence were in no danger from her; and that their attention was necessarily given to the St. John, which they were meeting and passing to the left.   It is not certain that the red light, alleged by the witnesses of the Pequot to have been seen at some distance on their port hand, was the light of the Demerest; although, in the absence of proof of the presence of any other vessel in that vicinity, it would seem probable that that red light was the Demerest's.   But neither seeing the Demerest's red light to port, nor the presence of the St. John on the starboard hand, could excuse the Pequot for not keeping any further watch upon her port side.   It is evident that after the red light was seen some considerable time elapsed before the Demerest's two whistles were given, when she was showing her green light; yet her changes of position and lights in the meantime had not been previously observed by the Pequot.   The Pequot was remiss, therefore, in not keeping a proper watch upon her port hand.   The Pequot gave one whistle in reply to the Demerest's two whistles.   At these contrary signals there was evident risk of collision; and the Pequot was guilty of the further fault of not immediately stopping and reversing as the rules require.   The order to reverse was not given until afterwards, when too late to be of any use.   The weight of evidence also shows that the collision was considerably on the Brooklyn side of the center of the river.   It is shown that the usual custom of such tugs coming down the river upon the ebb-tide is to go in towards the Brooklyn shore, of which the Pequot must have been aware.   Whether this custom be justifiable or not, the Pequot, knowing it, was bound to watch and see whether the Demerest, though on her port hand when at a distance, was not crossing to the Brooklyn shore as customary.   She was in fact doing so; and it was this fact, coupled with the Pequot's want of observing it, that brought about the collision.

The Demerest had no lookout, except the pilot in the wheel-house. I am not clear, however, that he did not have all the notice of the position of the Pequot that a lookout in addition could have given him.   But it is clear that the first answering whistle of the Pequot was one whistle only; and therefore the pilot of the Demerest could have heard but one from her.   With the vessels approaching at the rate of 12 or 14 miles an hour, and so nearly ahead, the danger of collision from that moment was manifest.   It was equally the duty of the Demerest, therefore, to stop and back at once.   She did not do so, but waited for a further exchange of contrary signals, when she reversed; but the collision was then inevitable.

The dazzling effect of the electric lights upon the bridge is such as to add to the difficulties of navigation in the night-time by vessels passing each other in that vicinity. Pilots, when nearing the bridge, cannot properly distinguish ordinary lights just beyond the bridge. Common prudence would therefore seem to require of all vessels approaching the bridge a material diminution of speed. For a distance of several hundred feet above and below, the effect of the brilliant lights of the bridge is to prevent the ordinary lights of vessels in the river from being recognized. In going through this space, boats are in no better position, as respects seeing lights, than in navigating through a fog; and there is the same reason for moderating speed in the one case as in the other. The evidence shows that the practice of moderating speed in nearing the bridge has been already, to some extent, adopted by prudent pilots. Neither the Pequot nor the Demerest in this case adopted this precaution. If they had done so, the collision would probably have been avoided. The above-mentioned violations of specific statutory rules, however, require that both shall be held answerable to the libelants.

The Demerest is, I think, chargeable with further fault in crossing the river towards the Brooklyn shore under the circumstances of this case. The custom of vessels coming down the river to go to the left, and near to the Brooklyn shore, in the region of Catharine ferry, is not one entitled to any favor; and to cross the river for this purpose from the New York shore, when not far above the bridge, and in the night-time, is peculiarly dangerous, considering the dazzling effect of the bridge lights, which prevent the pilots of steamers coming up from seeing vessels thus crossing ahead of them, as they ought to be seen to be properly avoided. Crossing to the left under such circumstances is manifestly dangerous to life and property. It cannot be justified or excused by any alleged practice or custom; and I must hold it to be at the peril of all vessels that voluntarily pursue such a practice, in the absence of any special circumstances of necessity requiring it.

The evidence shows in this case that below Jackson street the Demerest was still on the New York side of the river; and, in less than a third of a mile further down, she is found at least two-thirds of the way, and her own witnesses say much more, towards the Brooklyn shore, and her tow in collision with the Pequot. This crossing to the left was the primary and general cause of the collision. It is probable that the Demerest's red light was seen from the Pequot, and on the latter's port bow, as her witnesses allege; but this was when the Demerest was not far below Jackson street. Moreover, if the pilot of the Demerest could, as he says, see lights for a distance below the bridge, he ought to have seen the Pequot coming up; and if he saw her, he was bound to keep to the right. If, on the other hand, he could not see her on account of the bridge lights, nor the Pequot see his lights, the pilot of the Demerest was nevertheless bound to know that steamers, though not visible, were likely to be coming up, as the

Pequot was coming, near the center of the river; and he was therefore bound to avoid crossing the center of the river and going to the left towards the Brooklyn side, under circumstances in which neither could see the other in time to avoid collision. The libelant is entitled to a decree against both vessels, with costs.