LIVERPOOL, BRAZIL & RIVER PLATE STEAM NAV. CO., Limited, v. UNITED STATES.

UNITED STATES v. LIVERPOOL, BRAZIL & RIVER PLATE STEAM NAV. CO., Limited.

(District Court, S. D. New York. January 21, 1926.)

1. Collision ⬤=>38—"Course" of vessel, within regulations relating to crossing vessels, is actual course and not compass course (International Regulations for Preventing Collisions at Sea, arts. 19, 21, 22, 27, 28 [Comp. St. §§ 7858, 7860, 7861, 7866, 7867]).

Under International Regulations for Preventing Collisions at Sea, arts. 19, 21, 22, 27, and 28 (Comp. St. §§ 7858, 7860, 7861, 7866, 7867), providing that, where it is duty of one of two crossing vessels to keep out of way of other, the other shall keep her course and speed. the "course" of a vessel proceeding on a curved course is actual course, and not compass direction of the heading of vessel, when other vessel is sighted.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Course.]

2. Collision ⬤=>37—Crossing vessel on another's port held required to take notice of course of other vessel (International Regulations for Preventing Collisions at Sea, arts. 19, 21, 22, 27, 28 [Comp. St. §§ 7858, 7860, 7861, 7866, 7867]).

Under International Regulations for Preventing Collisions at Sea, arts. 19, 21, 22, 27, 28 (Comp. St. §§ 7858, 7860, 7861, 7866, 7867), vessel proceeding on curved course was not required to change her course for crossing vessel on her port, and it was duty of such other vessel to take notice of character of her course.

In Admiralty. Libel by the Liverpool, Brazil & River Plate Steam Navigation Company, Limited, against the United States, wherein respondent filed cross-bill. Decree for libelant, and cross-libel dismissed.

Burlingham, Veeder, Masten & Fearey, Charles C. Burlingham, and A. Howard Neely, all of New York City, for libelant.

Emory R. Buckner, U. S. Atty., and Anthony M. Menkel, and John Hunter, all of New York City, for the United States.

BONDY, District Judge. These suits were brought to recover damages arising out of a collision in the harbor of Rio de Janeiro, Brazil, between the British ship Romney and the American ship Monasses.

On November 26, 1920, at about 6:45 in the morning, the Romney left her anchorage, about 600 feet westerly of the Green Wreck Buoy, in the upper bay of the harbor of Rio de Janeiro, and, after proceeding a short distance in a northeasterly direction, ported gradually in an easy circle, keeping the buoy on her starboard side. With her engines under slow speed, and with the tide, the Romney was making between five and seven knots per hour.

Those in charge of the navigation of the Romney testified that the Monasses was first observed while the Romney was still porting and before she had completed the turn which she was making in order to go out to sea; that the Romney immediately, when she sighted the Monasses, sounded a one-blast whistle, and thereafter repeated a one-blast whistle three or four times, and in each instance received a two-blast signal in return from the Monasses; that when the Monasses was about 800 feet away, and when the collision became imminent, the Romney sounded a three-blast signal, reversed her engines, and swung to starboard, but the Monasses continued her course at a speed variously estimated at from three to seven knots an hour, without stopping, reversing, or reducing speed, until after the ships collided, six to eight minutes after they sighted one another.

Witnesses for the respondent testified that the Monasses left her anchorage, which was about 700 feet southeasterly from an anchored steamship, the Sundance, at about 7 o'clock, starboarded her helm to pass under the stern of the Sundance, and proceeded on a northwesterly course; that as she passed under the stern of the Sundance at about 7:06 a. m., the Romney was observed six points on the starboard, about three-quarters of a mile away, bearing directly towards the Monasses; that the Monasses immediately blew two short blasts on her whistle; that the Romney answered with one short blast, ported her helm, and swung to starboard; that the Monasses immediately again blew two short blasts, and the Romney again answered with one short blast, and again ported her helm and altered her course to starboard; that the Monasses again blew two short blasts; that the Romney then replied with three short blasts, ported her helm, and

swung sharply to starboard, and thereupon the Monasses replied with two blasts, starboarded her helm, and put her engines full speed ahead to minimize the effects of the collision.

Although the evidence is conflicting and unsatisfactory, the following facts were established: When the ships came into sight of one another, the Romney was on a southerly course, bound out to sea. The Monasses was heading in a westerly direction. The Romney had the Monasses on her port, and the Monasses the Romney on her starboard, side.

Articles 19, 21, 22, 27 and 28 of the International Regulations for Preventing Collisions at Sea (Comp. St. §§ 7858, 7860, 7861, 7866, 7867) governed the navigation. They provide that, when two steam vessels are crossing so as to involve the risk of collision, the vessel which has the other on the starboard side shall keep out of the way of the other, and shall, if the circumstances of the case admit, avoid crossing ahead of the other, and that where, under the rules, one of two vessels is to keep out of the way, the other shall keep her course and speed, and that in obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render departure from the above rules necessary in order to avoid immediate danger, and that when vessels are in sight of one another a steam vessel under way, in taking any course authorized or required by the rules, shall indicate that course, by one short blast to mean "I am directing my course to starboard," two short blasts to mean "I am directing my course to port," and three short blasts to mean "My engines are going at full speed astern."

The Monasses was at full speed ahead from the time she raised her anchor until the collision. She did not do anything whatsoever to avoid the collision, notwithstanding that, when the first signals were exchanged, the captain of the Monasses stated to the pilot that he did not like the situation, and the pilot said it could not be helped.

The respondent, however, contends that, when the Monasses and Romney first signaled one another, they were three-quarters of a mile or more apart, and that the Monasses then was at a point at which the course of the Romney intersected the course of the Monasses, and that under the circumstances the Monasses had the right to cross the bow of the Romney, and would safely have done so, had not the Romney altered her course and ported, when she should have held her course, and that, had she done so, she would have passed 1,600 feet astern of the Monasses.

The libelant contends that the Romney had been porting and steadying and swinging in an easy circle before the Monasses was sighted, and did not thereafter change her course, which was a turning and not a straight course. When the Romney sounded the first blast, she ported and steadied, and possibly did so again when she gave the second blast. The persons in charge of the navigation of the Monasses at the time that signals were exchanged observed that the Romney was not on a straight course, that her masts were opening up, and that she was apparently swinging to starboard.

There is no reliable evidence as to what the course of the Romney was before she was sighted by the Monasses, other than the testimony of those in charge of the navigation of the Romney. They testified that, when the Monasses was first observed, the Romney had not yet completed her turn and was still porting a little; that she had come down in a big circle close to the Green Buoy, and was porting and steadying all the time, and that when the first one-blast signal was given there was an order to port a little and then to steady, but that after that no further orders were given to the wheel. It undoubtedly was this porting and steadying all the time in the ebb tide that produced the course curving slightly to the starboard.

When the master of the Romney testified that he gave the one blast to show that his course was then being altered to starboard, and after that to show that he was keeping his course, he evidently meant, taking all his testimony into consideration, that he was altering it as he had theretofore been doing, by porting and steadying. Had the Romney been on a straight course three-quarters of a mile away, and had the Monasses reached a point at which its course intersected the course of the Romney when the boats came into sight of one another, as respondent contends, it is not probable that the Romney would have ported her helm to avoid the collision. In that event she probably would have continued her straight course and then passed safely astern of the Monasses.

[1] The course referred to in the International Regulations is the actual course, and not the compass direction, of the heading of the vessel at the time the other is sighted. The Roanoke, 11 Asp. M. C. (N. S.) 253; The Velocity, L. R. 3 P. C. 44; The Esk, L.

R. 3 P. C. 436; The Napoli, decided June 4, 1920, by Judge Learned Hand;[1] Lehigh Transportation Co. v. Central R. R. of N. J.,

decided June 7, 1920, by Judge Learned Hand.[2]

In The Esk, L. R. 3 P. C. 436, 448,

---

[1] Learned Hand, District Judge. I regard this as a case of crossing courses and the tug as the yielding vessel. It is true that the Napoli was not proceeding with a constant speed, but she was on a steady course, and her speed was as nearly constant as her purposes and destination permitted. It is not uncommon, with large vessels similarly situated, to hold a very slow speed in precisely this way, starting under one bell, stopping till the momentum has partly . run off, and then starting again. This does result in a varying speed, but, the navigation being usual, other masters are chargeable with observing and knowing it, and have the means of learning what the positions of a ship so proceeding will be at future moments, which is the presupposition in which the crossing rule applies.

Such being the situation, it is clear to me that the tug was at fault. I do not credit her master's testimony that the course of the Napoli was at any time ambiguous, not only because the great weight of testimony is against it, including that of the ferry, but also because, considering the conceded destination of the Napoli, it is little short of impossible that she should have headed down channel when off the buoy marking the northwest corner of the Gowanus anchorage ground. Her course was straight across the fairway when clear of Buttermilk Channel. The theory that she might have been nosing about for an anchorage on the west anchorage ground is, it is true, plausible, but still not satisfactory, since it is not shown that she was crowded for a berth, or that she could not lay a course direct to a satisfactory spot as soon as she .cleared Governor's Island.

Such being her apparent course, nothing prevented the tug from porting and passing under her stern, or from backing, or both. Nothing impeded the tug's navigation to the east, the ferryboat being far enough off and much faster. His course was clear, instead of which he kept on, starboarding a little from time to time, thus seeking, because of the Napoli's slow speed, to cross her bows. It was this, in my judgment, which fetched him up on the anchorage ground, where he never would normally have been, but for his insistence upon a right which he did not have. Possibly he supposed that by that insistence he might force the Napoli to yield, but it is idle to speculate upon his purposes, when his conduct is patent.

The only remaining question is of the Napoli's fault as holding-on vessel. Two faults are asserted against her: First, failing to keep her speed; second, failing to back when it became evident that the tug would not clear. The rule which requires a holding-on vessel to keep her speed does not, however, mean that she must change the speed as already disclosed. It means just the opposite; i. e., that she must not change what she is doing, because of the approach of the yielding vessel. The whole theory is that the yielding vessel shall be able to rely in her navigation upon what the holding-on vessel will do. This requires that the holding-on vessel shall act just as she has been acting, and, if she has been going with a varied speed, that

she shall keep varying that speed as before. It appears to me that the same analogy applies as in cases where the apparent course of the holding-on vessel is not straight. There it is held that in "holding her course" she must follow the usual changes of direction which her apparent course involves (The Velocity, L. R. 3 P. C. 44; The Esk, L. R. 3 P. C. 436), and should not lay a straight compass course after the vessels sight each other. So I' think that "keeping her speed" means keeping the apparent variation of speed, not changing it to a constant velocity. That would be only deceptive. The rule is similar to that frequently applied to ferries entering slips.

Finally, I cannot find that the Napoli was at fault for failing to back and drop anchor sooner. She is held, nowhere more strictly than in this circuit, to her duty of holding on. It is quite true that, had she backed sooner, the tug would have passed clear; but I am not disposed to figure too closely that period within which the tug could alone have avoided collision. The tide tables show high water at 10 o'clock, and by 12:30 the surface ebb had begun to make. Thus the tug was in a good position to hold her place against the current, and to port as well, if she had been so minded. The Napoli was not inattentive, and appears to have held on till in her judgment she must act. In such circumstances it is not usual to revise the judgment of the master as to the point where collision was unavoidable. In any case, the tug being certainly at fault, the fault, if any, of the Napoli is more readily condoned, especially as the burden is on the tug to establish some deviation from the rules.

The libel is dismissed; decree on the cross-libel, with costs:

[2] Learned Hand, District Judge. It is entirely apparent here that this is a crossing case, and not an overtaking case. I take the speed of the Powerful at between 6 and 7 miles an hour, and the ferry at not more than 11. At least, the speeds were not more than in the ratio of two to one in favor of the ferry. That being true, if the Powerful laid a course from 1,000 feet off the Battery to Pier A, and the ferry laid a course to her slip from the Communipaw Ferry slip, she would never have been two points abaft the beam of the Powerful from the time she emerged, and if one supposes that the courses were not compass courses, as is probably the fact, on the whole this favors the position that the courses were crossing. Therefore the Powerful was prima facie at fault for failing to keep out of the way, as was her duty. The only question that can arise is the duty of the ferry as holding-on vessel.

I need hardly repeat, what has so often been said in these cases, that the obligation is one of the most stringent which is placed upon a vessel under the sailing rules—at least as those rules are applied in this harbor. I will therefore not go too closely into exactly the proper moment at which the ferry should have backed and changed her speed. It is true that several of the witnesses say she did not do this until she got across the bows of the Powerful. If

speaking of the Velocity, the court said: "It held further that, if the case was one within the eighteenth rule, the Carbon was still to blame, inasmuch as she had not got out of the way of the Velocity, which had kept her course; their Lordships holding that, according to the true interpretation of the term in that rule, 'keeping her course,' she was at liberty to hold upon the course which she would have pursued, had no vessel been in sight, and was not bound to follow the direction in which her head, as she rounded the point, happened to be at the moment when she was first sighted."

[2] The Romney was not under any obligation to change her helm and lay a straight course. It was the duty of the Monasses to take notice of the character of the Romney's course. The captain and others on board the Monasses, observing that the Romney was not proceeding on a straight course, but was maintaining a curved course to starboard, made no effort to keep out of the way, or to avoid the collision or the risk of collision. Instead of stopping, reducing speed, reversing, or going to starboard in time to avoid the collision, the Monasses did the most dangerous thing possible by attempting to cross the Romney's bow, notwithstanding that the signals were crossed, and that the Romney refused to give assent to any maneuver not complying with the regulations.

The cross-libel of the United States, therefore, should be dismissed, and a decree entered in favor of the owners of the Romney.

---

that were to be taken literally, I would perhaps cast her in fault. But estimates of time are proverbially not reliable, and, although I have the highest impression of the master of the Powerful, I think it quite possible that he may have been mistaken in supposing that she waited until just in front of his bow before setting her engines in motion. At any rate, I am enough in doubt about that not to make any finding on it. As to her change of helm (and the testimony is not wholly clear on that) I am satisfied that it was not a change of helm for the purpose of avoiding collision, or, if it was, it was only in extremis, and any change of helm, which was part of her usual course in making her slip, was part of her apparent course, and the apparent course is that which she should keep. The rule only provides that she shall not change her course as part of the maneuver of avoiding a collision.

Therefore I find that the libel has not been proved, in the only aspect of it which could possibly cast the ferry in damages. It is not necessary for me to find affirmatively that she was not at fault. I find that there was no evidence that she was at fault, and so I dismiss the libel.