## THE PARIS. THE WILSTON. THE OVER-BROOK. THE BESSEGEN.

### FAY v. COMPAGNIA GÉNÉRALE TRANS-ATLANTIQUE, and six other cases.

District Court, S. D. New York. January 20, 1930.

Haight, Smith, Griffin & Deming, of New York City (John W. Griffin, of New York City, of counsel), for owner of the Bessegen, the Kingdom of Norway, and individual libelants in action of Jens Folksmans Rederi Aktieselskab et al.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar and Leonard J. Matteson, both of New York City, of counsel), for libelant American & Cuban S. S. Line.

Silas B. Axtell, of New York City (Elizabeth Robinson, of New York City, of counsel), for libelants Kay et al.

Joseph P. Nolan, of New York City, for claimant of the Paris.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for claimant of the Overbrook.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (W. H. McGrann, of New York City, of counsel), for claimant of the Wilston.

COXE, District Judge. These suits grow out of a collision at about 1:39 a. m. on October 15, 1927, between the steamship Paris of the French Line, while proceeding to sea, and the Norwegian steamship Bessegen, lying at anchor in the Upper Bay of New York City. As a result of the collision, the Bessegen, with a cargo of 30,506 bags of sugar, became a total loss, and seven of her seamen were drowned.

Libels have been filed against the Paris by (1) the owners and surviving members of the crew of the Bessegen; (2) the charterers of the Bessegen; (3) the owners of the cargo; and (4) the next of kin of the deceased seamen of the Bessegen. The Norwegian government has also filed an intervening libel for the burial charges and maintenance expense for the members of the Bessegen crew during the period immediately after the collision. The claimant of the Paris has impleaded the steamship Wilston and the tug Overbrook under the fifty-sixth rule; it being the contention of the Paris that they were primarily responsible for the collision. All of the libels, except those filed on behalf of the next of kin of the deceased seamen, are in rem. The cases have all been tried and argued together, and will be disposed of in one opinion.

The Paris is a large, fast passenger vessel, engaged in the regular transatlantic service between New York and Havre, and was on the night of the collision making her first night sailing from New York with 321 passengers and 820 crew. The Paris is 735 feet 5 inches long, 85 feet 4 inches beam, draws 32 feet 6 inches of water, has a gross tonnage of 34,000 tons, and is equipped with turbine engines and four screws. The Bessegen was a single-screw, coal-burning steel vessel, built in Japan in 1916, 315 feet long, 43 feet 9 inches beam, 27 feet 3 inches moulded depth, 5,100 tons dead weight capacity, and drawing, while loaded, at the time of the collision, 22 feet 6 inches of water.

The Paris sailed from Pier 57 in the Hudson River, which is at the foot of West Fifteenth street, New York City, at about 1 o'clock in the morning of October 15, 1927. The night was very clear, the moon shining, the tide slightly flood, and there was a light northwest breeze, blowing about 17 miles an hour. There were on the bridge of the Paris, at the time of sailing and during the trip down the bay, Capt. Thomas, the master of the vessel, pilot Oldmixon, two junior officers, Mariole and Gallais, and three sailors. The first officer, Le Friant, was at the stem of the vessel acting as a lookout, and there were also forward the carpenter, boatswain, and one sailor.

The story told by the master was as follows:

The vessel backed into the river, and, after dropping her tugs at 1:11 a. m., proceeded downstream at slow speed, on a course of 185 degrees true, with the lower end of Governor's Island slightly on her port bow. When abreast of the Statue of Liberty, and about 600 yards from El Sol (a wrecked vessel on the westerly side of and in the main channel just below the Statue of Liberty), he saw a tug (now claimed to be the Overbrook) and tow, 1½ to 2 points on his port bow, and 1,000 meters away, crossing his course east to west, and showing a green light and a cluster of white lights. The Paris thereupon blew one whistle and moved slightly to starboard. This was at 1:29 a. m., and at that moment the engines of the Paris were advanced from slow to half speed. Capt. Thomas explained this maneuver by saying that, when he saw the green light of the tug 1,000 meters away, he moved to the right because he considered "there was danger of a collision," and he increased the vessel's speed "to help swing to the right and avoid the tug boat." The tug did not reply to the first whistle from the Paris, and after an interval of about a minute, the Paris whistled a second time and again moved farther to starboard. This second whistle also remained unanswered, and after a further interval of a minute the Paris blew an alarm whistle and continued on her course, passing El Sol "no more than 15 feet" from the buoy marking the wreck. When abreast of El Sol, the tug changed her course to starboard, and cleared the Paris by "about 50 meters," at the same time that the Paris passed El Sol. The total starboard swing of the Paris, from the time the Overbrook and tow were first sighted 1,000 meters away, up to the time of passing El Sol, was stated to be about 2½ points.

When the Paris was about 200 yards above the El Sol buoy, Capt. Thomas saw the Wilston two points off the port bow of the Paris, 800 meters away. He estimated that the Wilston was anchored 600 meters below El Sol. He insisted, however, that when the Wilston was first seen it was impossible to stop the Paris and come to port to pass the Wilston to starboard, because there was not sufficient space, and the "Paris was swinging at the time to the right," and that if she came to the left her stern would have collided with El Sol. The Paris was thereupon brought sharply to starboard until she had "cleared the chain of the Wilston," when the helm was reversed in order to bring the Paris back into the main ship channel. In order to accelerate this movement, the starboard engines were placed at half speed ahead, and the port engines reversed at full speed. The Paris cleared the anchor chain of the Wilston by about 50 meters, and it was only then that the lights of the Bessegen were seen ahead on the port bow about 900 meters away. It was first thought that the Paris would be able to pass the Bessegen safely to starboard, but Capt. Thomas appears to have had some doubts on that subject, because he asked the pilot if it would be possible to go to the westward and pass between the Bessegen and the New Jersey shore, and was told that there was insufficient water, and that it was "quite impossible." After an interval of one or two minutes, the collision became inevitable. The engines were thereupon reversed full speed astern, alarm whistles were blown, and the vessels came together at 1:39 a. m. The Paris struck the Bessegen amidships on her starboard side, at an angle of 20 degrees, cutting through her plates, and opening her side to such an extent that the Bessegen turned on her side and sank within a very few minutes. The Paris immediately put out a lifeboat to aid in saving the Bessegen crew, and remained at the scene of the collision 1 hour and 20 minutes, after which she proceeded on her voyage to Havre.

The story told by Pilot Oldmixon differed materially from that of the master, and was as follows:

He took charge of the vessel after she had backed into the river at Pier 57 and had dropped her tugs. The course of the Paris down the river was 188 degrees to 190 degrees true, with the lower end of Governor's Island slightly on the port bow. When off the Battery, she ported, and gradually swung to a course of 208 degrees to 210 degrees true, and increased her speed to half speed. She steadied on this 210 course off the middle of Governor's Island, and then had El Sol slightly on her starboard bow. When off the middle of Governor's Island, and still on the 210 degree course, the green light of a tug and tow was sighted about 3,000 to 4,000 feet away. The Paris thereupon sounded a one-blast whistle twice, but neither signal was answered. Between the signals, the tug "seemed to stop." The Paris continued her course and speed. At the time of the second one-blast whistle, the Paris was between the lower end of Governor's Island and El Sol, and about 500 yards above El Sol. She passed El Sol about 50 feet off on her starboard side, and the tug 50 or

60 feet off her port side, porting her helm as she passed El Sol to get as far as possible to the west side of the channel. As she was swinging to starboard, the pilot blew an alarm whistle, and at the same time, and while she was passing El Sol, went to the port wing of the bridge and "saw the tow going clear." After the Paris had cleared El Sol, her helm was put to starboard in order to check the starboard swing and bring her back to the channel course. It was only while the Paris was swinging back to the 210 degree course that the pilot first saw the Wilston 1,500 feet ahead of him, and slightly on his port bow. The Paris was then about half her length past El Sol, and the Wilston was about 2,000 feet south of El Sol. The pilot immediately put the Paris back to starboard, and slowed the engines. The bridge maneuver book showed that the engines were slowed at 1:33 a. m., thus fixing the time when the pilot first saw the Wilston.

As the Paris was passing the Wilston at 1:35 a. m., her engines were put at half speed ahead, and her helm hard to starboard. The Paris passed to the west of the Wilston by 200 or 300 feet, and, as soon as the pilot saw that he was well clear of the Wilston anchor chain, the port engine was stopped and put full speed astern, the starboard engine being continued at half speed ahead. The engines remained in that condition for a minute and a half, or until 1:37 a. m., when the starboard engine was placed full speed ahead, at the time the Bessegen was sighted. The Paris then had a pronounced swing to port. The Greenville buoy was directly ahead when the Paris was passing the Wilston, and was well on the starboard side of the Paris when the pilot first saw the Bessegen. The Bessegen was about a point on the port bow of the Paris, and about 1,500 feet away when first seen by the pilot. He thought he could then safely swing the ship into the channel and pass to the eastward of the Bessegen. Before deciding to go to the eastward of the Bessegen, the pilot was asked by the master of the Paris if it was possible to pass between the Bessegen and the New Jersey shore, and was told that there was neither water nor room to do so. The starboard engines of the Paris were continued full speed ahead until 1:37½ a. m., when the pilot realized that a collision was inevitable, and the order was then given to put all engines full astern. At 1:38 a. m., an extra full astern order was given for the port engine, and at 1:39 a. m. the engines were stopped, and the collision occurred. The starboard bow of the Paris

struck the starboard side of the Bessegen about at the bridge, and seemed to slide along the Bessegen's side. The Paris was proceeding slowly at the time of the collision, and the force of the blow was hardly felt on the bridge. The Paris remained in contact with the Bessegen a short interval, while the Bessegen was listing to starboard, and then, as the Paris backed away, the Bessegen turned over and sank.

I find it extremely difficult to reconcile these two stories. But, no matter what version is accepted, I think the Paris was grievously at fault for serious errors of navigation and for failing to maintain a sufficient lookout. According to the master, the Paris was proceeding at slow speed when the tug was first seen 1½ to 2 points off the port bow and 1,000 meters away, showing a green light, and apparently crossing the course of the Paris east to west. On this testimony, *the Paris was the privileged vessel*, and required to keep her course and speed. Yet she appears to have done neither. The course was immediately changed slightly to starboard, and the speed was advanced to half speed at the moment the tug was sighted. Capt. Thomas explained that these changes were made because he considered there was "danger of a collision" and he wanted to "help swing to the right and avoid the tug boat."

But it is urged that the course of the Paris was a tortuous one, and that she was only required to hold her apparent course, which shaded gradually from 185 degrees at the Battery to 210 degrees at El Sol. This would be a sufficient answer if the change was not made "as part of the maneuver of avoiding a collision." Lehigh v. Central (D. C.) 12 F.(2d) 130, 131. It does not, however, explain the change of speed, which, according to the master, was made when he sighted the tug boat, in order to help her swing away from the tug boat. The Velocity, L. R. 3 P. C. 44; The Esk, L. R. 3 P. C. 436; The Napoli (D. C.) 12 F.(2d) 130; Liverpool v. U. S. (D C.) 12 F.(2d) 128. This change of speed was not only a violation of the rule, but also a grave error of judgment, in the face of what to the master appeared to be present danger.

The story of the pilot was quite different. He stated that his course down the river was 188 to 190 degrees true, and that he advanced the speed of the vessel to half speed when he passed the Battery, and before he saw the tug. He gave as a reason for doing so that "those ships are sailing at midnight for the pur-

pose of getting out" (at least suggesting that he was impatient to get to sea and advanced the speed of his ship in order to accomplish that purpose). Before the tug was even sighted, he put the Paris on a course of 210 degrees, which, he stated, was the channel course. He did not alter this course, except "maybe a degree or so to starboard" (which is really not a change of course at all, and is hardly perceptible), until he reached El Sol. Until then, he made no change of course for the tug. The presence of the tug, according to him, was in no way responsible for any change of course, because "it was a matter of holding on his [my] course." The tug, therefore, had no effect whatever on the speed or course of the Paris before reaching El Sol. Its only influence seemed to be to cause the pilot some mental anxiety when it looked as if a collision was probable close to El Sol.

██ If the master's story is accepted, I think the Paris was at fault in increasing her speed in the presence of what he believed to be present danger. If, on the other hand, the pilot's version is the correct one, the speed of the Paris from the Battery to El Sol was, in my opinion, excessive. Whichever story is accepted, I think the Paris should have stopped when her one-blast whistles were unanswered, and she appeared to be confronted with imminent danger.

The speed of the Paris was the subject of considerable controversy at the trial, and, although it is difficult to determine with exactness the speed at any particular point, I believe it may fairly be said that the speed as she approached El Sol was excessive, and was a contributing cause to what afterwards happened. The master testified that the Paris came down the river at slow speed of 8 or 9 knots, corresponding to 120 revolutions of the engines. He estimated that the current had a strength of 2 or 3 miles in addition, making a total speed at the Battery of 10 to 11 miles. He probably was in error about the current, as all through his testimony he referred to an ebb tide, which was directly contrary to the fact, as shown by the tide expert, Beebe, called on behalf of the Paris, who testified that there was a little flood tide in the North River from 1 to 1:29 a. m., and that it was slack water at the Statue of Liberty at 1:29 a. m. The tide, therefore, must have had practically no effect on the speed of the vessel.

The engines of the Paris were advanced to half speed at 1:28 a. m., somewhere in the vicinity of the Battery, and, according to the master, this gave a speed of 12 or 13 knots, corresponding to 150 revolutions of the engines. Le Friant, the first officer, testified that half speed was the equivalent of 13 miles, and counsel for the Paris has conceded in his brief that the speed of the Paris approaching El Sol was "in the neighborhood of 10 and 12 miles an hour." Admiral Robison, who testified as an expert for the libelants, was of the opinion that the 120 revolutions of the slow speed would give a speed in excess of 11 knots, and the 150 revolutions of the half speed a speed of about "14 or 15 knots speed through the water." Admiral Robison also attempted, by the use of the known factors of time and distance, to calculate the speed of the vessel from Pier 57 to El Sol, and he estimated that the average speed for this distance was 13 knots. There was also expert testimony by Capt. Ruser, formerly commodore of the Hamburg-American fleet, that harbor speed should not exceed a slow of 4 to 5 knots, a half speed of 8 knots, and a full speed of 10 knots.

What is the proper speed for the navigation of a steam vessel must necessarily depend upon the particular circumstances of each case. It is, therefore, idle to look for material assistance from such cases as The Colorado, 91 U. S. 692, 23 L. Ed. 379, where a speed of 9 to 10 miles on a dark, foggy night was condemned; The John H. Starin (C. C. A.) 122 F. 236, 239, where a speed of "about 12 knots an hour" on a clear night in New Haven Harbor was held not excessive; and The George H. Jones, 1928 A. M. C. 280, approved on the finding of excessive speed in (C. C. A.) 27 F.(2d) 665, 667, where a daylight speed of 10 miles an hour in the Kill Van Kull off Staten Island was declared to be "too high speed for the waters she was in."

I realize, too, that speed calculations of experts are never entirely reliable in cases of this kind, but I think that in the present case Admiral Robison's estimate of 14 or 15 knots at El Sol is nearly correct. I believe that was excessive speed; and, even if his average of 13 knots is accepted, I think that also was too much. It is not a sufficient answer to say that the night was clear, the conditions favorable, and the road to the sea open. If that were an accurate statement of fact, it might be persuasive; but subsequent events clearly demonstrated that the road to the sea was not open, but was subject to the ordinary vicissitudes of harbor travel, and with a vessel of the size and character of the Paris I can find no good reason for such a speed. Surely the reason given by the master, that the speed was

increased to pass the tug, is insufficient; nor is the reason given by the pilot, that he wanted to get his vessel quickly to sea, at all tenable. The Paris could, in my judgment, easily have been navigated satisfactorily at much less speed. The conduct of the Berlin and the Carmania, which preceded the Paris down the bay on the night of the collision, may fairly be taken as illustrative of what the speed of the Paris should properly have been. The speed of the Berlin at El Sol was 2 or 3 knots, and she actually stopped at that point, and the Carmania was proceeding at slow speed of 7 or 8 knots when she passed the El Sol wreck.

It was also the duty of the Paris to stop in the presence of danger, or even of anticipated danger, due to the proximity of the tug and the uncertainties of her movements. The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; The Cushing (C. C. A.) 292 F. 560, 563, 565; The Munaires (C. C. A.) 1 F.(2d) 13, 15. In The New York, supra, Mr. Justice Brown said at pages 201 and 207 of 175 U. S., 20 S. Ct. 72, 75, 44 L. Ed. 126:

"Nothing is better settled than that, if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty. * * * The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect."

The master thought there was danger of collision when the tug was first sighted 1,000 meters away. If his fear in that respect was at all justified, clearly he should have stopped, or at least slowed his engines. This was so, even though the Paris was the privileged vessel. And, when the tug failed to answer the second one-blast signal of the Paris, the danger, which previously had appeared possible, must certainly have become probable. It was the duty of the master at that point to have taken such reasonable precautions as ordinary prudence dictated, and one of these was to have stopped the speed of his vessel—certainly not to have accelerated it.

[4, 5] The law further imposes a rigid obligation on a moving vessel to maintain a careful, vigilant, and effective lookout, whose duty shall be both to observe and to report. The lookout on such a vessel as the Paris must properly be stationed forward, and not on the bridge. These principles are so well established that it hardly seems necessary to cite authorities to sustain them. Chamberlain v. Ward, 21 How. 548, 16 L. Ed. 211; The Ottawa, 3 Wall. 269, 18 L. Ed. 165; The Ariadne, 13 Wall. 475, 478, 479, 20 L. Ed. 542; Dahlmer v. Bay State Co. (C. C. A.) 26 F.(2d) 603; The Felix Taussig (C. C. A.) 5 F.(2d) 612.

In Chamberlain v. Ward, supra, Mr. Justice Clifford said at page 570 of 21 How., 16 L. Ed. 211:

"Steamers navigating in the thoroughfares of commerce must have constant and vigilant lookouts stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must be actually employed in the performance of the duty to which they are assigned. To constitute a compliance with the requirements of law, they must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of the duty; and for a failure in either of those particulars, the vessel and her owners are responsible."

In The Ottawa, supra, Mr. Justice Clifford, at page 273 of 3 Wall., 18 L. Ed. 165, said:

"Proper lookouts are competent persons other than the master and helmsman, properly stationed for that purpose, on the forward part of the vessel; and the pilot house in the night time, especially if it is very dark, and the view is obstructed, is not the proper place."

In The Felix Taussig, supra, Judge Hunt said at page 615 of 5 F.(2d):

"The excuse offered by the lookout, that the pilot was in charge, cannot be accepted. A lookout must use his ears, as well as his eyes, and must report what he hears as well as what he sees."

The Paris had a sufficient number of men on the bridge, and the first officer, Le Friant, was at the stem of the vessel acting as a lookout. Le Friant testified that it was not his practice to report what he saw or heard, except "when it is foggy." That, however, was denied by the master, who maintained that "generally they do" report. But, irrespective of what the general practice may have been, Le Friant, the lookout, did not report the tug when she was first sighted by him 1,200 meters away; nor did he report the Bessegen when he first saw her, and when he did report her, three minutes later, he believed the collision to be inevitable.

But it is argued there was no need of any report from the lookout, because everything was observed from the bridge fully as soon as it was by the lookout. If this were a sufficient answer, which I deny, there still would be no adequate explanation of the failure of the lookout, master, pilot, and junior officers of the Paris to see the Wilston and the Bessegen in ample time to have avoided going on the anchorage ground at all. No one seems to have seen the Wilston until the Paris was near to or abreast of El Sol. The explanation given was that up to the time of passing El Sol the attention of every one had been focused on the tug, and that the lights on El Sol were so blinding and confusing as to interfere with vision beyond. Obviously, neither of these reasons presents an adequate excuse. The peril of the tug was never so compelling as to eliminate all watchfulness for other dangers. And the presence of dazzling or confusing lights only emphasized the necessity of added care to guard against uncertainties in the situation. The A. Demerest (D. C.) 25 F. 921; The John G. McCullough (D. C.) 232 F. 637, affirmed (C. C. A.) 239 F. 111.

It is also insisted that the failure of the Paris to see the Bessegen sooner was due to the presence of the Wilston directly in the line of vision. But the night was clear, and all the conditions were as favorable for ready observation during night navigation as they could reasonably be expected to be. And it is inconceivable that, with a proper lookout, the Bessegen should not have been seen before the danger of collision became imminent.

The lights of the Bessegen were visible for miles, and even if the Wilston was directly in line between the Paris and the Bessegen, I do not believe it possible that the lights of the Bessegen could have been obscured, especially as the position of the Paris was constantly changing as she moved forward. The Paris' bridge was 64 feet 4 inches above the water; her deck at the stem where the lookout was stationed was 48 feet 5 inches from the water line. The forward light of the Bessegen was more than 40 feet above the water, and the highest point of the top structure of the Wilston was only 39 feet 3 inches above the water. Manifestly, there was nothing in the position of the Wilston to obscure the Bessegen's lights if the lookout and the officers on the bridge had been vigilant and attentive to their duties.

The navigation of the Paris over the anchorage ground has been the subject of much testimony, and has been elaborately argued by counsel; but in the view I have taken of the case I do not deem it necessary to enter into any extended discussion of the various maneuvers during the somewhat crowded period of 9 or 10 minutes between the time when the Wilston was first sighted and the time of the collision. It is insisted by the libelants that the Paris should never have undertaken to pass to the eastward of the Bessegen, but should have gone to starboard and passed between the Bessegen and the New Jersey shore. Then, too, it is insisted that when the Bessegen was first sighted, and the Paris was rounding the anchorage chain of the Wilston the Paris should have stopped, and her anchors should have been released in order to retard her forward progress.

Whether these maneuvers were proper or not, I do not feel called upon to decide, as I am clear that the initial faults of the Paris were the inducing causes of the collision, and unloosed a train of circumstances which led inevitably to the disaster. But, accepting the argument in the most favorable light possible for the Paris, and assuming that the movements of the Paris after passing El Sol were either correct or in extremis, there still would be no exoneration of the Paris, from the natural consequences of her own prior negligence. The Protector (C. C. A.) 113 F. 868; The Pacific (C. C. A.) 154 F. 943; The Elizabeth Jones, 112 U. S. 514, 5 S. Ct. 468, 28 L. Ed. 812.

Nor is it necessary to discuss the defense of inevitable accident, as there is nothing in the facts presented in this case to sustain such a contention. The Virginia Ehrman, 97 U. S. 309, 315, 24 L. Ed. 890; The Clara v. Cox (The Clarita and The Clara) 23 Wall. 1, 13, 23 L. Ed. 146; The Charles Hubbard (C. C. A.) 229 F. 352; The Edmund Moran (C. C. A.) 180 F. 700.

But it is insisted that the Bessegen was not showing proper lights at the time of the collision, and was off the anchorage ground. The testimony with respect to the lights was positive, clear, and convincing, that they were proper, and were showing brightly at the time of the collision. Indeed, there was no contradiction of that fact, the only criticism being that the lamps burned oil, and therefore did not have sufficient illuminating power. The mere statement of that contention would seem, however, to carry its own refutation, and does not, I think, require any discussion.

The proof showing that the Bessegen was within the anchorage limits was little short of overwhelming. Capt. Hassel of the Bessegen testified that he arrived in New York on Oc-

tober 2, 1927, with a cargo of 30,506 bags of sugar, and, after discharging some of his deck cargo at Pier 63, North River, came down to the anchorage ground on October 4, 1927, and anchored his vessel at a point, which he marked on the chart, well within the anchorage limits. He fixed his position with reference to a clump of spiles known as the Dolphin. He stated that the anchorage of the Bessegen remained unchanged continuously from October 4, 1927, until the collision on October 15, 1927.

Capt. Leitch of the Wilston placed the Bessegen well within the anchorage. So also did five captains of the municipal ferryboats, American Legion, Queens, and Bronx, all engaged on regular runs between the Battery and Staten Island. These ferryboat captains ran courses on their southbound trips which necessarily took them over or close to the southerly corner of the anchorage, and they were, therefore, in a most advantageous position to speak with first-hand knowledge regarding the Bessegen; and they all testified that, during the 10 days the Bessegen was on the anchorage ground she in no way interfered with their navigation, but was at all times within the anchorage limits. The testimony of these captains was largely disinterested, most persuasive, and of a high order.

The libelants also called eight tug boat captains, who used the Greenville channel going to and from Greenville, and they all testified positively that the Bessegen was well inside of the anchorage ground, and did not in any way interfere with their navigation through the Greenville channel.

The location of the Bessegen was further corroborated by Tilley, a diver, on a dredge operating at El Sol on the night of the collision, who placed the Bessegen west of a line drawn from El Sol to Robbins Reef light. But by far the strongest evidence of the Bessegen's position was given by Coast Guard Officers Wicklund and Christiensen, whose regular duty it was to police the anchorage grounds, and report vessels beyond the anchorage limits. Both of these witnesses testified positively that the Bessegen was well on the anchorage ground on October 14, 1927, and had been for some days prior to the collision. Wicklund made an inspection as late as 2 p. m. on October 14, 1927, and actually found a Spanish vessel, the Manuel Calvo, off the anchorage, and ordered her to move. His testimony was particularly valuable, in that he was the only witness who was able to determine accurately the anchorage boundaries. He testified that the easterly boundary was on a line drawn from the northerly end of the Marine Hospital, or from Pier 12, on Staten Island, to the white buoy off Ellis Island. He further identified this easterly boundary as identical with a bearing line of 205 degrees from the white buoy off Ellis Island. The testimony of these two Coast Guard witnesses was of the highest type, and entitled to the greatest weight. U. S. v. King Coal Co. (C. C. A.) 5 F.(2d) 780; The Cohocton (D. C.) 299 F. 316.

In The Cohocton, supra, Judge Ward said, at page 317, as follows: "The Cohocton remained two or three days at the same anchorage, and if she had been in the fairway I think the federal authorities would have required her to be moved."

The testimony of the Paris in contradiction of the libelants' witnesses was not only extremely meager, but is entitled to practically no weight as against the overwhelming character of the proof of the libelants. Indeed, some of the witnesses for the Paris gave testimony strongly corroborating the testimony of the libelants' witnesses.

But it is insisted that the Bessegen could not have been on the anchorage ground, because her anchor chain did not break, and the Bessegen wreck was found and located about 600 feet south of the southerly boundary of the anchorage limits. The argument is that the Bessegen must, therefore, have been in the place where the wreck was found. I do not deem it necessary to review all of the testimony, mostly expert, on this subject, as I am convinced that the Bessegen was on the anchorage ground, and I am clear that her anchor must have dragged. The Bessegen, at the time of collision, was headed a little west of north, and had not entirely completed her swing on the ebb tide. Her chain of 45 fathoms was, therefore, slack, and when the Paris cut into her side at an angle of 20 to 25 degrees, the probabilities are that she was shoved forward by the superior weight of the Paris, carrying her chain with her until she finally turned over and sank, 10 or 15 minutes after the collision, in the position in which her wreck was found.

I therefore find, on all of the evidence, that the Bessegen was properly anchored within the anchorage limits at the time of the collision.

The cross-libels against the Overbrook and the Wilston remain for consideration. The Overbrook left Greenville, N. J., at 1:05 a. m. on October 15, 1927, with six lighters in tow, arranged in two tiers of three boats each, on 10 fathom hawsers. The master

742

was at the wheel, and the lookout in the pilot house. The Overbrook was bound for Pier 15 in the East River, which is at the foot of Montague street, Brooklyn.

The testimony of Donnelly, master of the Overbrook, was as follows: He came out of Greenville channel and headed across to the can buoy marking the western side of the Red Hook anchorage. He then turned to port and proceeded upstream on the range of the two lights on the western side of Governor's Island. When about opposite El Sol, a large steamer was observed on the port bow, coming out of the North River, proceeding downstream on the western side of the channel. The steamer sounded one blast, which the Overbrook answered with one blast when about abreast of El Sol. The steamer and the tug were then about half a mile apart, and the vessels were showing only their port lights to each other. The tug maintained her course on the range of the Governor's Island lights, and proceeded to her destination at Pier 15, Brooklyn, where she arrived about 2:30 a. m.

The testimony identifying the tug seen by the Paris as the Overbrook is not at all satisfactory. No one on the Paris was able to make the identification. Indeed, no one on the Paris, except Gallais, the second officer, heard any whistle from the tug, and he stated that this was a "one whistle after the alarm signals." Yet Donnelly, the master of the Overbrook, was positive that he answered the one whistle from the Paris with one answering whistle.

The two witnesses called by the Paris to identify the Overbrook did not place her where the Paris alleged her to be. Gilliken, the master of the tug Bouker No. 4, testified that he met and passed the Overbrook port to port off Governor's Island in midstream of the main ship channel, and that the Overbrook was "bound north up the river." It may well be doubted whether this testimony has any value whatever, as it referred only to the time when the Paris "was backed up toward the Statue of Liberty," which, obviously, was after the collision. But, however that may be, it is highly improbable that the tug identified by Gilliken could have been the tug seen by the Paris.

Schwartz, the other witness for the Paris, was pilot of the tug Du Bois, which, with mud scows in tow, was proceeding down the easterly side of the main ship channel, so far to that side that she passed the Red Hook anchorage buoy only 125 feet off to port. He testified that he saw a tug, which he claimed to be the Overbrook, proceeding up on the western edge of the main ship channel and below El Sol; that this tug was "coming straight up the channel," and on a course to pass the Paris starboard to starboard, each vessel showing both side lights to the other. In other words, the Overbrook was the width of the channel, or about 2,500 feet, away from the Du Bois, and yet he assumed to identify the Overbrook as the tug which, according to the pilot of the Paris, passed within 50 feet when the Paris was at El Sol. Furthermore, the witness denied that there was any tow in the position described by the witnesses for the Paris. He did testify, however, that he heard the Paris blow one whistle, which was answered by one whistle from the Overbrook.

Testimony such as this cannot be accepted to fasten liability on the Overbrook. It is too uncertain and conjectural. The A. E. Ackerman (C. C. A.) 269 F. 612. It is insisted, however, that the identity of the Overbrook was established by her own admission that she answered the first one-whistle signal of the Paris. Obviously, though, that does not prove that she was in the position described by the Paris' witnesses as interfering with the navigation of the Paris. And I cannot believe that she could have been in such a position at a time when the large ocean liners were putting to sea.

Donnelly, of the Overbrook, impressed me as a thoroughly competent navigator, who told a straightforward story. Manifestly, there was no reason for him to cross the channel east to west in order to get to Pier 15 in Brooklyn. It may be that, as he turned to come up the river, he uncovered for a brief interval his green light; but that is a long ways from placing him on a crossing course east to west, and within a very short distance of El Sol. It may be remarked in passing that, although the pilot of the Paris estimated that the tug was only 50 feet away as the Paris passed El Sol, Le Friant, the lookout, testified that the tug and the Paris passed each other "150 meters on the port side."

I do not think, therefore, that any fault is properly chargeable against the Overbrook.

■ The faults charged against the Wilston are that she did not have proper anchor lights, and was anchored in the main ship channel in such a way as to obstruct navigation. With respect to the lights, the proof

was clear and satisfactory that they were regulation anchor lights, properly set, and burning brightly at the time of and just prior to the collision. Indeed, there was no contradiction of that fact, and all of the witnesses for the Paris testified to seeing the lights.

The location of the Wilston presents, however, a more troublesome question. The Wilston is an English cargo vessel, 345 feet long, 48 feet beam, and 32 feet 10 inches moulded depth. At the time of the collision she was under charter to the Munson Steamship Line, and had been at Edgewater, N. J., discharging sugar, up to 6 p. m., on October 14, 1927. After discharging her cargo, the Wilston left Edgewater at 6:15 p. m., and proceeded to the anchorage ground in the company of the tug John J. Timmins of the Dalzell Towing Company. Capt. Hanson, master of that tug, testified that he anchored the Wilston at 8:10 p. m. on October 14, 1927, on the anchorage ground below El Sol, and that he found her in the same identical position the following morning, between 6 and 7 o'clock, when he took her to Robins dry dock. He marked the range which he used in anchoring the vessel on one of the charts, Exhibit 52, from the easterly El Sol buoy to Robbins Reef, that line running directly across the anchorage. He testified that the Wilston was anchored to the west of this range, and so marked her on the chart.

There was also the testimony of the officers of the Wilston that actual compass observations of her anchored position were taken at the time she was anchored, and contemporaneously entered in the vessel's log book. These bearings were taken by the second officer, Boyle, and were checked and verified by the chief officer, Groves. They were plotted on the chart, and placed the Wilston well inside the anchorage ground and clear of the channel. This testimony was further corroborated by the master of the Wilston, who also placed her on the anchorage ground.

In addition to the foregoing, there was positive testimony by a number of witnesses called by the other parties to the litigation to the effect that the Wilston was on the anchorage ground. The testimony of Tilley, the diver at El Sol, was particularly impressive, as he made his observations just before the collision, and he placed the Wilston to the west of the range between El Sol and Robbins Reef light.

The testimony for the Paris with respect to the anchorage of the Wilston came principally from three pilots, one of whom was vitally interested, and the other two at least sympathetic, with Pilot Oldmixon's cause. Oldmixon testified that the Wilston "appeared to me to be well in the channel." He later stated, "I think she was" in the channel. Lowe, the pilot of the Carmania, testified that the Carmania left Pier 56, North River, a few minutes after 12 on the night of the collision, and proceeded down past El Sol at slow speed of about 7 or 8 knots, and that after passing El Sol he saw an anchored steamer "directly ahead of me," and in the channel for outgoing ships; that he thereupon gave the order "full speed ahead starboard," and swung the Carmania out "probably about 1,000 feet" before he straightened out and proceeded to sea.

Miller, the pilot of the Berlin, testified that the Berlin left Pier 42, North River, about 12:15 a. m. on October 15, 1927, and followed the Majestic and the Carmania down the river; that he stopped his vessel just before reaching El Sol, which he passed at a speed of 2 or 3 knots about 150 feet off; that his engines were stopped at El Sol for about 5 minutes, and he changed his course about 10 degrees to the westward when abreast of El Sol, bringing the vessel to a course of 210 degrees; and that after he had been on this course about two ship's lengths, he made out a hull ahead, starboarded 7 or 8 degrees to pass under her stern, and proceeded to sea. He admitted, however, that he had no difficulty in navigating past her.

Capt. Thomas, when asked if the Bessegen and the Wilston were in the channel, answered: "Yes, sir. They were very near the limits of the channel." Le Friant, the lookout, testified that the Wilston "was anchored on the right side of the river." And so it was with the other witnesses for the Paris, all of whom were necessarily unable to state definitely whether the Wilston was or was not on the anchorage ground, because there was nothing to mark the boundaries, and it was largely a matter of guesswork with them just where the boundary lines were.

There is, however, one significant piece of evidence bearing on the whole question of the Wilston's position, and that is the rough diagram (Paris Exhibit 1) prepared by Mariole, the fourth officer of the Paris, a few hours after the collision. Mariole was on the bridge of the Paris during the trip down the river and at the time of the colli-

sion, and his diagram is obviously something more than a rough drawing. Yet he placed the Wilston only slightly tailing into the channel, and in a position where she could hardly have been an obstruction to navigation.

From this great mass of evidence, I am bound to give the greatest weight to the testimony regarding the compass bearings, especially as the record of those bearings was made contemporaneously in the Wilston log, which was produced at the trial. 2 Moore on Facts, Page 1242, Par. 1106; The Atkins Hughes (D.C.) 199 F. 938, 940. Neither do I think that such evidence can be overthrown by the interested testimony of the three pilots, particularly as Pilots Lowe and Miller encountered no difficulty in navigating past the Wilston. Then there is the testimony of the officers of the Wilston, squarely contradicting the testimony of the three pilots, and that, too, is entitled to weight in the determination of the question.

I think, also, that the probabilities favor the contention of the Wilston. Nearly all of the witnesses agree that the Wilston was anchored more to the eastward than the Bessegen. Furthermore, it has been established that there was practically no surface tide, and that the vessels had not completed their swing. The Wilston, therefore, being light, was probably headed more up and down the channel than the Bessegen. Concededly, the wind from the northwest was so moderate that it had little, if any, effect. The anchor chain of the Wilston was 45 fathoms in length, and her distance from the Bessegen was variously estimated at 300 to 500 yards by the officers of the Wilston, and 900 meters by Gallais, the second officer of the Paris. The Paris, as she approached El Sol, was on a pronounced starboard swing, which the pilot tried to check as he was passing El Sol. He passed El Sol so close that he was unable to go to port for fear of throwing his stern into the El Sol wreck. This the pilot himself admitted. It was also conceded by Gallais, the second officer of the Paris, who testified "that it was impossible to go to the left, because we would have touched El Sol with the back of our ship." In other words, the Paris

had so much starboard movement, and was so near the wreck when passing El Sol, that she could not safely go to port without throwing her own stern against El Sol.

The excessive starboard swing of the Paris prior to El Sol was sufficient in itself, in my opinion, to carry her onto the anchorage ground, and her further swing from a course of 210 degrees to the extreme westerly course of 230 degrees to pass the Wilston indicates a deep penetration of the anchorage ground before the turn-back to the heading of 184 degrees, which was her course at the time of the collision. I believe, therefore, that the great weight of the evidence supports the contention of the Wilston that she was within the anchorage limits at the time of the collision. In any event, I am clear that she was not an obstruction to navigation so as to make her in any way responsible for the sinking of the Bessegen. The Pocahontas (C. C. A.) 235 F. 116; Strathleven S. S. Co. v. Baulch (C. C. A.) 244 F. 412; The Job H. Jackson (D. C.) 144 F. 896, 900.

The libels filed by the next of kin of the deceased members of the crew of the Bessegen remain only for consideration. Those libels are in personam, and it is contended that they should be dismissed, because "the pilot was in sole charge of the navigation of the ship." But the pilot was not in sole charge of the ship's navigation, and the faults found against the Paris were not such as to relieve the ship's owner from liability. The China, 7 Wall. (74 U. S.) 53, 19 L. Ed. 67; Jure v. United Fruit Co. (C. C. A.) 6 F.(2d) 6; Charente v. U. S. (C. C. A.) 12 F.(2d) 412; Rich v. Hamburg-American Packet Co. (D. C.) 117 F. 751, 753.

I think, also, that the crew of the Bessegen, and the master and his wife, are entitled to reasonable compensation for their exposure and suffering, due to their being forced into the water after the collision.

It follows, therefore, that decrees may be entered holding the Paris solely at fault for the collision, and dismissing the cross-libels against the Overbrook and the Wilston.